# ABBOTT LABORATORIES ET AL. v. PORTLAND RETAIL DRUGGISTS ASSN., INC.

No. 74-1274. Argued December 16, 1975—Decided March 24, 1976

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., filed a concurring opinion, *post*, p. 21. STEWART, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 23. STEVENS, J., took no part in the consideration or decision of the case.

*James H. Clarke* argued the cause for petitioners. With him on the briefs were *William B. Crow, Garry P. McMurry, R. R. Bullivant, Walter J. Cosgrave, Jack L. Kennedy, Thomas M. Triplett, Robert R. Carney,* and *Barnes H. Ellis.*

*Roger Tilbury* argued the cause for respondent. With him on the briefs was *Henry Kane.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The Robinson-Patman Price Discrimination Act (Robinson-Patman), adopted in 1936, 49 Stat. 1526, amending § 2 of the Clayton Act, 38 Stat. 730, in general makes it unlawful for one engaged in commerce to dis-

---

**Richard J. Wertheimer* and *Cary H. Sherman* filed a brief for the American Hospital Assn. as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *H. R. Burnham* and *James Allen Main* for the Alabama Pharmaceutical Assn. et al.; and by *Arthur B. Hanson, W. Frank Stickle, Jr.,* and *Sidney Waller* for the American Pharmaceutical Assn. et al.

criminate in price between different purchasers of like commodities where, among other things, "the effect of such discrimination may be substantially to lessen competition." 15 U. S. C. § 13 (a). The Nonprofit Institutions Act, adopted only two years later, in 1938, c. 283, 52 Stat. 446, exempts from the application of Robinson-Patman "purchases of their supplies for their own use by schools . . . hospitals, and charitable institutions not operated for profit." 15 U. S. C. § 13c.[1]

This case concerns nonprofit hospitals' purchases of products at favored prices from pharmaceutical companies. The issue is the proper construction of the phrase "purchases of their supplies for their own use," as it appears in the Nonprofit Institutions Act, and the consequent extent the hospitals' purchases are exempt from the proscription of Robinson-Patman.

## I

Petitioners are 12 manufacturers of pharmaceutical products. Respondent, an Oregon nonprofit corporation and assignee of more than 60 commercial pharmacies doing business in the metropolitan Portland, Ore., area, instituted this action against petitioners in the United States District Court for the District of Oregon for violations of the federal antitrust laws. Treble damages and injunctive relief were sought.

The amended complaint asserted five causes of action. Only one of the five (the second) is presently before us.[2]

---

[1] "Nothing in sections 13 to 13b and 21a of this title, shall apply to purchases of their supplies for their own use by schools, colleges, universities, public libraries, churches, hospitals, and charitable institutions not operated for profit."

[2] Causes of action based on discrimination in sales to city, county, and state governments, and to the Federal Government (the third and fourth causes of action asserted in the amended complaint, Record 61–62) were dismissed for failure to state a claim. App. 292. A cause of action based on discrimination in sales to proprietary

In this claim the respondent alleged that in selling pharmaceutical products petitioners discriminated between nonprofit hospitals, on the one hand, and commercial pharmacies (regular drugstores), including respondent's assignors, on the other. As an affirmative defense, petitioners pleaded that their sales of pharmaceutical products to nonprofit hospitals were exempt from Robinson-Patman under the Nonprofit Institutions Act.

The parties engaged in discovery as to the nonprofit status and drug-dispensing practices of 14 designated metropolitan Portland area institutions that operate as nonprofit hospitals. Affidavits were obtained and filed. Petitioners, as defendants, pursuant to Fed. Rule Civ. Proc. 56 (b), then moved for summary judgment on the amended complaint's second cause of action. App. 68.

The District Court, by an opinion delivered orally, ruled that all the designated institutions were nonprofit hospitals, and that their purchases of pharmaceutical products from petitioners were purchases of supplies "for their own use," within the language of 15 U. S. C. § 13c, and thus were exempt from the restrictions of Robinson-Patman. The court concluded, accordingly, that there was no issue as to any material fact with respect to the hospitals' nonprofit status or their use of the pharmaceutical products they purchased, and granted summary judgment in favor of the petitioners on the respondent's second cause of action. App. 278–288, 290–292.

The District Court, id., at 292, certified its judgment under 28 U. S. C. § 1292 (b), and the United States Court of Appeals for the Ninth Circuit permitted the interlocutory appeal to be taken. The Court of Appeals, while

hospitals and commercial entities, and one that the alleged discriminations were the product of a conspiracy (the amended complaint's first and fifth causes of action, Record 52–61, 62–63), remain pending.

rejecting respondent's contentions that the designated hospitals did not qualify for exemption under § 13c,[3] nevertheless vacated the District Court's judgment and remanded the case for further proceedings. 510 F. 2d 486 (1974).

Because of the importance of the issue in the context of the modern nonprofit hospital, with its expanding service to the community, as compared with hospital operations of some years ago, and because of the obvious need for a definitive construction of language in the Nonprofit Institutions Act,[4] we granted certiorari. 422 U. S. 1040 (1975).

## II

The pertinent facts are not really in dispute. The petitioners, admittedly, sell their pharmaceutical products to the designated Portland hospitals at prices less than those that govern petitioners' sales of like products to the respondent's assignors who are commercial pharmacists in Portland. The respective hospitals in turn dispense the pharmaceutical products they have so purchased from the petitioners. The application of Robinson-Patman to this situation is conceded except to the extent the exemption provision of the Nonprofit Institutions Act applies. The controversy, thus, comes into clear focus.

---

[3] The sole exception was Bess Kaiser Hospital. As to this institution, the Court of Appeals concluded that certain factors "appear to present disputed issues of fact," and that the "proper legal standard" for determining whether that hospital was " 'not operated for profit' " could not be developed "on the limited record" before the court. The issue, therefore, was to be resolved on remand. 510 F. 2d 486, 488 (1974). No review of this aspect of the Court of Appeals' judgment has been sought, and that detail is not before us. Neither are we confronted here with an issue as to the nonprofit status, within § 13c, of the other 13 hospitals.

[4] See the same Court of Appeals' decision in *Logan Lanes, Inc.* v. *Brunswick Corp.*, 378 F. 2d 212, cert. denied, 389 U. S. 898 (1967).

Each of the designated hospitals has a pharmacy. It is a separate department of the hospital. Its operation produces revenue in excess of costs. The net accrues to the hospital's benefit, is utilized for the institution's general purposes, and thus supports other activities of the hospital.

The District Court, App. 283–285, and the Court of Appeals, 510 F. 2d, at 489, each perceived various categories of dispensations by the hospital pharmacies of the pharmaceutical products purchased from petitioners. But the District Court, in sustaining petitioners' motion for summary judgment, observed that "the vast majority" of the products purchased (85% to 95%), namely, those for the bed patient and for the patient receiving treatment in the hospitals' emergency facilities, were "clearly" for the hospitals' use, within the meaning of the Nonprofit Institutions Act, App. 283; that "out-patient treatment," whether "initial or repeated," was not outside that Act merely because there has been a "change in the distribution of health care" whereby the percentage of outpatient treatment increased since the statute was passed in 1938, id., at 284; that "take-home drugs" were within the "clear meaning" of the statute, ibid.; that drugs furnished to employees, staff physicians, and other members of the staff, while presenting "some mild degree of question," nevertheless were "for the use of the hospital," id., at 285; and that the situation with respect to walk-in patients was insufficient in amount to "justify withdrawing" the statute's exemption, ibid.

The Court of Appeals agreed that the inpatient and emergency facility situations "cover by far the greater part of hospital distribution," and that "such dispensing of drugs in the course of treatment in the hospital is the hospitals' [sic] own use." 510 F. 2d, at 489. The court recited petitioners' asserted justifications for the other types of sales "as proper hospital functions": the need

8

of the departing inpatient for take-home drugs; the continuation at home of the patient's treatment begun earlier in the hospital; the sales to employees as being pursuant to collective-bargaining agreements; the sales to students as being aspects of the hospital's educational programs; the sales to physicians as being perquisites of hospital staff membership; the limitation of walk-in sales to instances where, at the time, the needed drugs could not be obtained elsewhere; the hospital's position "as a center for the provision of a full range of health services"; and "a decent regard for the needs of the community." *Ibid.*

But, conceding that "distribution by the hospitals can be justified as a proper and useful community service and thus can be regarded as a proper hospital function," the Court of Appeals concluded that this was not necessarily "the hospitals' 'own use.'" Instead, said the court, hospital use under § 13c was limited to cases where the hospital can be said to be the consumer, that is, to those cases where the dispensations of drugs were to inpatients and emergency facility patients. The concept could not apply "to cases of resale by the hospital to a private consumer." Accordingly, as to such sales, the hospital may not acquire the pharmaceutical products "at an acquisition price that discriminates against local retail druggists." *Ibid.*

### III

We, too, find it convenient to view the hospitals' sales and dispensations of the pharmaceutical products purchased from petitioners as falling into several categories.[5] We divide them as follows:

---

[5] The record does not show that each of the designated hospitals made dispensations in each category. It does indicate that dispensations in each category were made by the hospitals considered as a group. Some hospitals refused to make certain types of dispensations. It would serve no useful purpose for us to describe

1. To the inpatient for use in his treatment at the hospital. For present purposes, we define an inpatient as one admitted to the hospital for at least overnight bed occupancy.[6]

2. To the patient admitted to the hospital's emergency facility for use in the patient's treatment there. A patient in this category may or may not become an inpatient, as defined in the preceding paragraph.

3. To the outpatient for personal use on the hospital premises. For present purposes, we define an outpatient as one (other than an inpatient or a patient admitted to the emergency facility) who receives treatment or consultation on the premises.

4. To the inpatient, or to the emergency facility patient, upon his discharge and for his personal use away from the premises.

5. To the outpatient for personal use away from the premises.

6. To the former patient, by way of a renewal of a prescription given when he was an inpatient, an emergency facility patient, or an outpatient.

7. To the hospital's employee or student for personal use or for the use of his dependent.[7]

---

the extent to which each individual hospital made dispensations in the several categories.

[6] A patient admitted for overnight bed occupancy, in the estimation of the several affiants whose affidavits appear in the record, clearly is an "inpatient." Some would carry the description further to include a patient admitted only for day surgery, or one who remains 12 hours or more, irrespective of overnight bed occupancy. In view of our disposition of the case, these distinctions are of no consequence here.

[7] The record seemingly contains no reference to a dispensation to a special duty nurse, chaplain, or similar nonemployee professional, on duty at the hospital. We place any dispensation of this type in the same category as one to the hospital's employee or student.

8. To the physician who is a member of the hospital's staff, but who is not its employee, for personal use or for the use of his dependent.

9. To the physician, who is a member of the hospital's staff, for dispensation in the course of the physician's private practice away from the hospital.

10. To the walk-in customer who is not a patient of the hospital.[8]

This division into categories reveals, of course, that we are concerned with linedrawing. The demarcation is somewhat simplified, on this record, by a concession on the part of the respondent. The respondent agrees with the Court of Appeals that the dispensing of drugs " 'in the course of treatment in the hospital is the hospitals' [*sic*] own use,' " regardless of whether the patient is technically described as an outpatient or as an inpatient. It does not matter, the respondent says, "whether the patient is occupying a bed or not"; thus, a "day surgery patient receiving medication while being treated in the hospital would be covered [that is, the sale to him would be exempt] whether in bed or not, as would one receiving a shot or pill while standing upright or otherwise in the outpatient clinic." Brief for Respondent 11. See also Tr. of Oral Arg. 29.

This concession, then, covers the above-listed categories 1, 2, and 3. We hasten to add, however, that if the respondent had made no concession as to these three categories, we would have reached the same result, for it seems to us to be very clear that a hospital's purchase of pharmaceutical products that are dispensed to and consumed by a patient on the hospital premises, whether that patient is bedded, or is seen in the emergency

---

[8] This division into 10 categories may not be exhaustive. It appears to cover, however, the several types of dispensations indicated by the record.

facility, or is only an outpatient, is a purchase of supplies for the hospital's "own use," within § 13c. In our view, as the respondent's concession indicates, this is so clear that it needs no further explication.

Before we turn to the remaining categories, we should state that we recognize, as the parties do, that the concept of the nonprofit hospital and its appropriate and necessary activity has vastly changed and developed since the enactment of the Nonprofit Institutions Act in 1938. The intervening decades have seen the hospital assume a larger community character. Some hospitals, indeed, truly have become centers for the "delivery" of health care. The nonprofit hospital no longer is a receiving facility only for the bedridden, the surgical patient, and the critical emergency. It has become a place where the community is readily inclined to turn, and—because of increasing costs, physician specialization, shortage of general practitioners, and other factors—is often compelled to turn, whenever a medical problem of import presents itself. The emergency room has become a facility for all who need it and it no longer is restricted to cases previously authorized by members of the staff. And patients that not long ago required bed care are often now treated on an ambulatory and outpatient basis. See *Eastern Kentucky Welfare Rights Organization* v. *Simon,* 165 U. S. App. D. C. 239, 249, 506 F. 2d 1278, 1288 (1974), cert. granted, 421 U. S. 975 (1975); Brodie & Graber, Institutional Pharmacy Practice in the 1970's, 28 Am. J. Hosp. Pharm. 240, 241 (1971).

## IV

It has been said, of course, that the antitrust laws, and Robinson-Patman in particular, are to be construed liberally, and that the exceptions from their application are to be construed strictly. *United States* v. *McKesson*

& *Robbins,* 351 U. S. 305, 316 (1956); *FMC* v. *Seatrain Lines, Inc.,* 411 U. S. 726, 733 (1973); *Perkins* v. *Standard Oil Co.,* 395 U. S. 642, 646–647 (1969). The Court has recognized, also, that Robinson-Patman "was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *FTC* v. *Broch & Co.,* 363 U. S. 166, 168 (1960); *FTC* v. *Fred Meyer, Inc.,* 390 U. S. 341, 349 (1968). Because the Act is remedial, it is to be construed broadly to effectuate its purposes. See *Tcherepnin* v. *Knight,* 389 U. S. 332, 336 (1967); *Peyton* v. *Rowe,* 391 U. S. 54, 65 (1968). Implied antitrust immunity is not favored. *United States* v. *National Assn. Securities Dealers,* 422 U. S. 694, 719 (1975). "[O]ur cases have repeatedly established that there is a heavy presumption against implicit [antitrust] exemptions." *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 787 (1975); *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 350–351 (1963). And the focus of Robinson-Patman is on competition "at the same functional level." *FTC* v. *Sun Oil Co.,* 371 U. S. 505, 520 (1963).

But the legislative history of the Nonprofit Institutions Act indicates clearly that that Act was concerned with the suspicion that Robinson-Patman, at the time just recently enacted, actually might operate to outlaw price favors that sellers would wish to grant to eleemosynary institutions. S. Rep. No. 1769, 75th Cong., 3d Sess., 1 (1938); H. R. Rep. No. 2161, 75th Cong., 3d Sess., 1 (1938). The parties here seek to utilize this legislative history in opposite ways. The respondent asserts that the statutory assurance of exemption "was never intended to countenance a mass invasion of the retail drug sale market by hospitals," Brief for Respondent 34, and that what Congress had in mind was "the role traditionally occupied by hospitals," *id.,* at 35. The petitioners assert

that the 1938 statute "was written to assist a wide range of nonprofit institutions to operate at the lowest possible cost in the public interest," Brief for Petitioners 17, and that the focus was on the character of the institution, not on the particular features of its program, and not only on those institutions that operated at a loss, *id.*, at 17–18.

We are not fully persuaded by either view. The modern American hospital developed from an institution originally intended for the sick poor. See *Eastern Kentucky Welfare Rights Organization* v. *Simon,* 165 U. S. App. D. C., at 249, 506 F. 2d, at 1288; E. Fisch, D. Freed, & E. Schachter, Charities and Charitable Foundations § 322 (1974); Bromberg, The Charitable Hospital, 20 Cath. U. L. Rev. 237, 238–240 (1970). Language in the bill which became the 1938 Act, that would have exempted only sales to nonprofit institutions "supported in whole or in part by public subscriptions," was deleted, 83 Cong. Rec. 6065 (1938), and the Act's exemption provision was not so restricted and confined. We thus do not relate the exemption to what might be described as the nonprofit hospital's original or "traditional" status. On the other hand, there is nothing in the Act that indicates that its exemption provision is to be applied and expanded automatically to whatever new venture the nonprofit hospital finds attractive in these changing days. The Congress surely did not intend to give the hospital a blank check. Had it so intended, it would not have qualified purchases by nonprofit institutions in the way it did in § 13c. See H. R. Rep. No. 1983, 90th Cong., 2d Sess., 78–79 (1968). We are concerned, after all, with an exemption from an antitrust statute, and the accepted general principles, hereinabove set forth, do have application even in the nonprofit hospital context.

14

We therefore conclude that the exemption provision of the Nonprofit Institutions Act is a limited one; that just because it is a nonprofit hospital that is purchasing pharmaceutical products does not mean that all its purchases are exempt from Robinson-Patman; that the test is the obvious one inherent in the language of the statute, namely, "purchases of their supplies for their own use"; and that "their own use" is what reasonably may be regarded as use *by the hospital* in the sense that such use is a part of and promotes the hospital's intended institutional operation in the care of persons who are its patients. This implies the limitation and it turns the measure naturally from the purchase to the use, as § 13c requires. In this focus we consider the several categories listed above.

V

1, 2, and 3. As to these three categories, we reiterate our conclusions already enunciated in the light of the concession by the respondent. Dispensation to the bed-occupying inpatient and to the patient at the hospital's emergency facility, in either case for use on the hospital premises, is a part of the institution's basic function, and is dispensation for the hospital's "own use." That it is the patient rather than the hospital that consumes is not determinative, and, indeed, the respondent here does not contend otherwise. A like result follows with respect to dispensation to the hospital's outpatient when that patient uses the pharmaceutical product on the hospital's premises.

4 and 5. The take-home prescription, usually a continuance of, or supplement to, what has been prescriptively administered at the hospital while the recipient was an inpatient, emergency facility patient, or outpatient, takes us, to be sure, one small step beyond and outside the hospital's door. The patient is released from

care to continue his treatment and recuperation under something less than the hospital's emergency or routine intensive, regular, or, even, more casual care (if it offers that type), and less than its consultative service at its outpatient facility. The release from the hospital environment into the home is the next step in the chain of treatment on the patient's way to his resumption of normal activity completely free of treatment. The medical supervision and the hospital's participation in it to this point, at least, although approaching an end, are continuous and real, and are distinct parts of the transition from hospital care to home care. We therefore conclude that the genuine take-home prescription, intended, for a limited and reasonable time, as a continuation of, or supplement to, the treatment that was administered at the hospital to the patient who needed, and now continues to need, that treatment, is for the hospital's "own use." We therefore disagree with the Court of Appeals as to categories 4 and 5. We feel that a contrary ruling on our part would unduly and undeservedly emphasize the doorsill of the hospital, and that to draw a line at that threshold would be arbitrary and not consistent with congressional intent. In these instances, the hospital's "own use" of the pharmaceutical products extends realistically and not inappropriately somewhat beyond that threshold.

6. We conclude, however, that the refill for the hospital's former patient is on the other side of the line that divides that which is in the hospital's "own use" from that which is not. Inevitably, in accord with the test above set forth, there comes a point where the dispensation of pharmaceutical products is not for the institution's "own use." That point, we feel, is positioned short of the refill. Continuation of a drug's use for some time after initial prescription at the hospital may well be indicated for the particular patient, but, except for the lim-

ited take-home prescription referred to above, it is not the hospital's "own use," and it certainly is not for its "own use" forever just because it originated under hospital auspices. We conclude that the statute's limitation has been exceeded when the connection with the hospital has become as attenuated as it is at the refill stage.

7. Dispensation to the hospital's employee or to its student for the purchaser's personal use or for the use of his dependent poses a somewhat different problem. A hospital is an organization populated by persons rendering essential services of various kinds. The hospital's employees enable it to function. The hospital pharmacy is but a part of the whole; the employee and his services are other parts. And to the extent the institution has students on the medical and hospital scene—interns, persons in the hospital's nursing, practical nursing, and nurse's aide programs, those in paramedical, chaplaincy, and administrative fields, and the like—the connection with the hospital's purposes and its activities is obvious and institutionally intimate. We conclude, therefore, that dispensation by the pharmacy to the hospital's employee or student, each of whom, literally, is a member of the hospital family, for his own use or for the use of his dependent, enhances the hospital function and qualifies as being in the hospital's "own use," within the meaning of § 13c.[9] But we draw the line between dispensation for the employee's or the student's personal use, or for the use of his dependent, on the one hand, and that for the use of another, even a nondependent family member, on the other.

8 and 9. What we have said in the preceding paragraph applies with equal force to dispensation to a

___

[9] The fact that, with respect to employees, the availability of the hospital pharmacy might be the compelled subject of a collective-bargaining agreement, in our view, cannot be controlling.

physician member of the staff for his personal use or for the personal use of his dependent. The physician staff member, though not an employee in the technical sense of being full time in the hospital's service and on its payroll, nevertheless is vital to its existence. It is he who supplies the patient and who engages, perhaps directly and at least to some extent through the staff organization, in the formulation of the hospital's professional and operative policies. His activity at the hospital is in the hospital's use—its very purpose for existence—and dispensation to the physician and his dependent, we think, is for the hospital's "own use," within § 13c.

We again draw the line, however, when the physician's acquisition from the hospital pharmacy is not for his personal use or that of his dependent, or is not for the hospital. To the extent that the physician utilizes his proximity to the hospital pharmacy, and it permits him so to do, for other persons or other uses—even, as this record occasionally intimates, for dispensation in that portion of his private practice unconnected with the hospital—the requirement of the hospital's "own use" is not fulfilled. Here again the relationship is too attenuated for the statutory benefit, and we hold that § 13c definitely is not satisfied.

10. The walk-in prescription buyer for the most part affords little difficulty for us in the context of § 13c. Even though one acknowledges the full weight of the argument that the modern hospital is a different institution from what it was when the Nonprofit Institutions Act was adopted in 1938, and that increasingly it has become a focus of health care in the community, the extension of § 13c to the walk-in customer, who has no present connection with the hospital and its pharmacy other than as a place to have his prescription filled, would

make the commercially advantaged hospital pharmacy just another community drug store open to all comers for prescription services and devastatingly positioned with respect to competing commercial pharmacies. This would extend the hospital's "own use" concept beyond that contemplated by Congress in § 13c.

We therefore hold that the walk-in buyer generally is not within the statute's exemption. We recognize, however, that there may be an occasion when the hospital pharmacy is the only one available in the community to meet a particular emergency situation. The respondent seeks to counter this possibility with a telephone book yellow-page reference to the providing of 24-hour service, and of some emergency or delivery service, by certain metropolitan Portland retail pharmacies. Brief for Respondent 56. That may be. We are content, however, to conclude that the occasional emergency is *de minimis*, in any event, and that its presence solitarily would not trigger litigation of the present kind. So long as the hospital pharmacy holds the emergency situation within bounds, and entertains it only as a humanitarian gesture, we shall not condemn the hospital and its suppliers to a Robinson-Patman violation because of the presence of the occasional walk-in dispensation of that type.[10]

---

[10] We referred above, in n. 4, to *Logan Lanes, Inc.* v. *Brunswick Corp.* The parties, in their respective ways, seek to make as much as possible of that decision. *Logan Lanes* was a treble-damages suit centering in the sale by Brunswick, to a Utah State Board, of bowling lanes and related equipment at prices lower than Brunswick charged Logan for similar equipment. The items purchased by the board were installed in a state university's student union building, and, while they were "primarily for the use of students, faculty and staff of the University," were also used by members of the public. 378 F. 2d, at 214. The public use during the 20 months following installation, according to affidavits presented by Brunswick, amounted to 2,934 lines bowled out of a total of 128,349. The trial court

## VI

The petitioners suggest that a decision holding some dispensations by the nonprofit hospital not to be exempt establishes an objectionable and unworkable standard for hospitals and their suppliers because it "requires a segregation of drugs or accounting of their use

---

granted Brunswick's motion for summary judgment. One ground for this ruling was that the purchase was exempt under § 13c. The Ninth Circuit affirmed. It refused to restrict the statute's use of the term "supplies" to consumables and noncapital items and, instead, held that the term embraced anything required to meet the qualified institution's needs. It concluded that the exact amount of public use was immaterial and that, even assuming "the public made substantial use of the University bowling facilities," 378 F. 2d, at 217, the purchases in question were made by the nonprofit university for its own use. The situation presented by *Students Book Co.* v. *Washington Law Book Co.*, 98 U. S. App. D. C. 49, 232 F. 2d 49 (1955), cert. denied, 350 U. S. 988 (1956), also cited by the parties here, was distinguished.

The latter case concerned sales of lawbooks to self-sustaining campus bookstores for resale at a profit. The Court of Appeals held, 98 U. S. App. D. C., at 50–51, n. 5, 232 F. 2d, at 50–51, n. 5, that these were not sales to universities "for their own use," within the meaning of § 13c. The defendant, however, prevailed on another ground.

We agree with the court in the *Students Book Co.* case that the purchases challenged there were not purchases by a nonprofit institution of the type to which § 13c relates. Those in *Logan Lanes,* in contrast, were. The Ninth Circuit apparently would distinguish *Logan Lanes* from the present case on the ground that "[p]lant equipment acquired for a university's own use cannot be segregated from that acquired for use by others, since the same equipment serves both uses." 510 F. 2d, at 490. It went on to say that the situation "of supplies acquired for consumption . . . is otherwise." *Ibid.* The court regarded the present case as factually similar to *Students Book Co.* As we have just stated, however, we are in accord with the District of Columbia Circuit's characterization of the bookstore purchases as not being transactions with the universities at all, but with the campus bookstores for resale at the latter's profit.

that can be achieved only through the institution of clumsy and expensive dual supply or tracing systems to regulate and account for the use of drugs." Brief for Petitioners 28. They suggest the undesirability of a supplier's "controlling the disposition of merchandise in the hands of a purchaser," citing *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365, 379 (1967), and they speak of the supplier's "retroactive exposure to claims." Brief for Petitioners 29.

Petitioners' concern is understandable, but we feel that it is overstated. Looking at the problem from the point of view of the purchasing hospital, two alternatives, and perhaps more,[11] are presented. The first, and easier, is for the hospital pharmacy *not* to dispense in any way hereinabove held to be outside the exemption of § 13c. The second is for the pharmacy to do exactly what the petitioners deplore, namely to establish a recordkeeping procedure that segregates the nonexempt use from the exempt use. This would be supplemented by the hospital's submission to its supplier of an appropriate accounting followed by the price adjustment that is indicated. This, to be sure, is cumbersome, but it obviously is the price the Congress has exacted for the benefits bestowed by the controlling legislation, and it should be no more cumbersome than the accounting demands that are made on commercial enterprises of all kinds in our complex society of today.

The supplier, on the other hand, properly may expect to be protected from antitrust liability for reasonable and noncollusive reliance upon its hospital customer's certification as to its dispensation of the products it purchases

---

[11] Our reference to two alternatives is not meant to be exclusive. Imaginative suppliers and purchasers may well come up with other and better means to alleviate whatever routine recordkeeping details and burdens may exist.

from the supplier. But it is not unreasonable to expect the supplier to assume the burden of obtaining the certification when it seeks to enjoy, with the institutional purchaser, the benefits provided by § 13c. It clearly does this with respect to responsibility for identification of its purchaser under that statute's standard, and little additional burden is imposed if it is required to take the small second step of routinely obtaining a representation from its hospital customer as to the use of the products purchased.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion. Costs are allowed to petitioners to the extent of 50%.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, concurring.

While I join the Court's opinion, I wish to add a word about the applicability of the exemption provided by the Nonprofit Institutions Act. To my mind, the key to the Act is that it exempts from the Robinson-Patman Act not only an itemized list of institutions, but also all "charitable institutions not operated for profit." 15 U. S. C. § 13c. This suggests to me that the named institutions—schools, colleges, universities, public libraries, churches, and hospitals—were not intended to be limited to their traditional activities in qualifying for the exemption, but may expand those activities and still qualify so long as any new activities for which exempted supplies are purchased are charitable and not operated for profit.

I agree with the Court that the exemption is not "to be applied and expanded automatically to whatever new

venture the nonprofit hospital finds attractive in these changing days." *Ante,* at 13. But I believe the exemption *is* applicable to any new venture the hospital finds attractive and that is both charitable and not operated for profit. There is no suggestion—nor could one be made—that the activities the Court today finds outside the exemption fall within this category,* so there is no need to address this problem here. But I write to emphasize that I do not read the Court's opinion as foreclosing hospitals—or other exempted institutions—from expanding their charitable activities in highly untraditional ways and still qualifying for the exemption.

Likewise, I agree with the Court that the proper inquiry in this case is whether each kind of drug sale by the hospital "is a part of and promotes the hospital's intended institutional operation in the care of persons who are its patients." *Ante,* at 14. However, when a nonprofit institution makes sales for profit, as here, analysis is furthered, I suggest, by recognition of the purpose of the "own use" limitation.

Since all charitable institutions are covered by the Act, the purpose quite obviously is not to freeze a particular charitable institution into a particular kind of charity. Rather, as I understand it, the purpose of the limitation is generally to preclude the institution from taking advantage of its antitrust exemption by buying low-cost supplies solely for the purpose of reselling them at a profit. That is, Congress was primarily interested in directly aiding nonprofit institutions by lowering their operating expenses, but not interested in indirectly aiding

---

*This case would be much more difficult for me if the hospitals involved did not all make profits on the sale of drugs to outsiders. *Ante,* at 7. If they did not, we would have to determine in each case whether such sales, even if not within the hospital's institutional function, nonetheless constituted a "charitable" venture of their own.

such institutions by providing them with the means of raising additional money—particularly when such resales of supplies would put the institution in competition with retail businesses not eligible for the exemption. While I do not believe Congress meant to preclude profit-making sales in the course of the institution's charitable activities—and so I agree that the Court's inquiry is the correct one—I suggest that the nexus between particular sales and those activities should be particularly closely scrutinized when a profit is made to assure that the sales are not made primarily for moneymaking purposes. Thus, sales only arguably within the scope of the institution's charitable activities might be exempted when made on a nonprofit basis and not exempted when made for profit. After analysis with this balancing factor in mind, I agree with the lines drawn by the Court and concur in its opinion.

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN joins, dissenting.

It is common ground in this case that the dispensation of pharmaceutical products for consumption by a hospital's patients upon the hospital's premises constitutes the hospital's "own use" of the products within the meaning of 15 U. S. C. § 13c. The controversy concerns the various other "uses" of these products catalogued in the Court's opinion. *Ante,* at 8–10. As to those uses the Court of Appeals expressed its views as follows:

> "We may concede that in these respects distribution by the hospitals can be justified as a proper and useful community service and thus can be regarded as a proper hospital function. It is not, however, the hospitals' 'own use.' . . . The purpose for which these supplies are purchased—the use to which they are to be put—is their consumption. Section 13c

24

can apply here only to cases in which a hospital can be said to be the consumer. It cannot apply to cases of resale by the hospital to a private consumer.

"The hospitals here are (quite properly) accommodating patients, staff and strangers with means whereby they can conveniently purchase for *their* use. The question is not whether the hospitals can continue to provide this useful community service. The question is whether in providing it they may acquire the drugs for such resale at an acquisition price that discriminates against local retail druggists. We hold that they may not." 510 F. 2d 486, 489.

I agree with the Court of Appeals and would affirm its judgment.