**WTWV, INC., Plaintiff-Appellant,**

v.

**NATIONAL FOOTBALL LEAGUE and Miami Dolphins, Ltd., Defendants-Appellees.**

No. 81–5857.

United States Court of Appeals, Eleventh Circuit.

June 11, 1982.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, C. Timothy Corcoran, III, Sylvia H. Walbolt, Tampa, Fla., for plaintiff-appellant.

Covington & Burling, Gary R. Roberts, John Vanderstar, Washington, D. C., for National Football League.

Sparber, Shevin, Rosen, Shapo & Heilbonner, Robert L. Shevin, Miami, Fla., for Miami Dolphins, Ltd.

Before RONEY and FAY, Circuit Judges, and EDENFIELD *, District Judge.

RONEY, Circuit Judge:

Do the antitrust laws prevent a professional football team from "blacking out" the television broadcast of its home games by a station physically outside of the team's "home territory" that broadcasts a signal deeply into that territory? Simply put, the answer turns on the interpretation of an exception to an exception to an exemption from the antitrust law. Deciding that signal penetration rather than station location was the focus of the controlling exemption, the district court said no, the antitrust laws do not prevent such a blackout. We affirm.

■ Although laden with substantial technical and historical arguments which have merit on both sides, this decision is premised to some extent on the common sense approach that Congress intended to permit professional football teams to engage in limited antitrust activity to protect

* Honorable Newell Edenfield, U. S. District Judge for the Northern District of Georgia, sitting by designation. This case is being decided by a quorum due to the death of Judge Edenfield on December 27, 1981. 28 U.S.C. § 46(d).

their home game ticket sales. To follow the arguments of the television station, whatever their technical and theoretical quality, would go a long way toward defeating that purpose. If at all possible, courts should interpret statutory language in a way that accomplishes the obvious purpose of Congress in enacting the statute. *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979).

Plaintiff owns and operates television station WTVX located north of Miami. Defendants are the National Football League and the Miami Dolphins. The NFL By-laws prohibit telecasts of home games within a club's home territory except by agreement between the participating clubs. The home territory is defined by the NFL's Constitution and By-laws as "the surrounding territory to the extent of 75 miles in every direction" from the city limits of the club's franchise city. When WTVX, previously viewed within a relatively small area, began broadcasting from a new, more powerful transmitter located 96 miles north of Miami, its signal penetrated 40 miles into the Dolphins' home territory. The Dolphins thereupon refused to authorize the broadcast of its unsold-out home games by WTVX.

Plaintiff brought suit for damages and injunctive relief, alleging, among other things, violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1. Although otherwise illegal, agreements by a professional sports league to sell the television rights to contests of its member clubs enjoy a statutory *exemption* from application of the antitrust laws. 15 U.S.C.A. § 1291.[1] The exemption does not apply to any agreement that restricts "televising any games within any area, except within the home territory of a member club of the league on a day when such club is playing a game at home." 15 U.S.C.A. § 1292.[2] Thus the exact question here is whether the exception to the exception to the exemption means the antitrust law applies or does not apply. Stated in terms the nonlawyer football fan might understand, the Dolphins can legally prevent the "televising" within its home territory of its home games. The legal question is whether the word "televising" means originating a signal, thus permitting "black out" only when the transmitter is located within the home territory. If so, the plaintiff gets a season pass. Its transmitter from which the televised signal originates is located outside of the Dolphins' home territory. If, on the other hand, the word "televising" refers to the area in which a signal is received, the Dolphins win yet another game because the station's signal is readily received inside its home territory by some 40 miles.

■ This is a matter of statutory construction. Although there has been some litigation involving the antitrust exemption for telecasting of professional sports contests, this is a case of first impression. Because WTVX is located well outside the Dolphins' home territory, plaintiff contends that the blackout is not within the exemption. The district court, however, agreed with defendants that signal penetration rather than station location should determine which television stations are televising within a club's home territory. *WTWV, Inc. v. National Football League*, No. 80–8306–Civ–JCP (S.D.Fla. July 21, 1981). We believe that the signal penetration defini-

---

1. Section 1291 provides in pertinent part:

   The antitrust laws ... shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games ... engaged in or conducted by such clubs ....

2. Section 1292 provides:

   Section 1291 of this title shall not apply to any joint agreement described in the first sentence in such section which prohibits any person to whom such rights are sold or transferred from televising any games within any area, except within the home territory of a member club of the league on a day when such club is playing a game at home.

tion better achieves the purpose of the statute.

The legislation in question was enacted in response to two landmark decisions by District Judge Allan K. Grim of the Eastern District of Pennsylvania. *United States v. National Football League*, 116 F.Supp. 319 (E.D.Pa.1953), *petition for construction of final judgment*, 196 F.Supp. 445 (E.D.Pa. 1961). Prior to 1951 NFL clubs were selling their television rights individually and making their own arrangements for telecasts of their games. Television was in its relative infancy at that time, and the clubs were feeling their way to methods of using this new medium without jeopardizing their gate attendance or affecting their relationship as co-producers of a common entertainment product.

Recognizing their economic interdependency, the NFL clubs had adopted By-law provisions which prevented clubs from telecasting their games into other clubs' home territories in competition with the playing of home games or the telecasting of away games. The term "home territory," defined as the area within 75 miles of a League city, was considered the natural marketing area for the sale of tickets.

The Justice Department, viewing these By-law provisions as representing anti-competitive agreements among the member clubs because they accorded each club exclusive television rights within its home territory, filed suit. In 1953 Judge Grim held many of the NFL's television and radio broadcasting restrictions illegal under the federal antitrust laws, but he did sustain a limited blackout privilege for the broadcast of "outside games" within the home territory of clubs playing at home. *United States v. National Football League*, 116 F.Supp. 319 (E.D.Pa.1953).

By 1961 the rival American Football League had negotiated a joint television pooling contract with one of the networks. Under this joint agreement, the AFL contracted with the network on behalf of all its clubs, and the clubs divided broadcasting revenues evenly. The NFL wished to do the same but was faced with the 1953 decree of Judge Grim. Accordingly, the NFL went back to Judge Grim for a determination of whether its joint television pooling contract with the network would violate the court's earlier decree prohibiting certain League television practices as violations of the federal antitrust laws. Judge Grim found that it did and voided the contract. *United States v. National Football League*, 196 F.Supp. 445 (E.D.Pa.1961).

Seventy-two days later Congress enacted an antitrust exemption for agreements among member clubs of professional sports leagues to pool and sell as a package to television networks the rights to televise their games. 15 U.S.C.A. § 1291. The following section partially removes the exemption, however, thus making a *restriction* on the televising of games illegal, *except* "within the home territory" of a club playing at home.

The stated purpose of the legislation was to enable the member clubs of professional sports leagues to pool their separate rights in sponsored telecasting of their games and permit the league to sell the resulting package without violating the antitrust laws. S.Rep.No.1087, 87th Cong. 1st Sess., *reprinted in* [1961] *U.S.Code Cong. & Ad.News* 3042. Accommodation of antitrust principles was believed necessary to protect the weaker clubs and ultimately preserve the League. What Congress meant by the statutory language is the issue in contention here. Each side offers testimony from the trials, hearings, and debates supporting its position. The district court commented, "A legislative history sufficient to fill seven volumes is full of contraindications."

Briefly, the plaintiff makes the following argument. The district court erred in not following established principles of statutory construction. The United States Supreme Court has noted that antitrust exemptions should be narrowly construed, *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979); *Abbott Laboratories v. Portland Retail Druggists Association*, 425 U.S. 1, 11–12, 96 S.Ct. 1305, 1313–1314, 47 L.Ed.2d 537 (1976), and has strictly construed anti-

trust exemptions even where a broader interpretation was reasonable. *Federal Maritime Commission v. Seatrain Lines, Inc.*, 411 U.S. 726, 732–33, 93 S.Ct. 1773, 1778–79, 36 L.Ed.2d 620 (1973); *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 315–16, 76 S.Ct. 937, 943–44, 100 L.Ed. 1209 (1956). Because station location is a discrete, known factor in contrast to the indefinite standard of signal penetration, the district court should have accepted station location as the narrow interpretation. Another rule of statutory construction was broken by the district court when it relied on events occurring after the statute's enactment to discern the original legislative intent. *See United States v. Wise*, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962); *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1080 (5th Cir.), *cert. denied*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). Even if post-enactment legislative history and cases are considered, they do not favor signal penetration over station location. Failure to amend the statute does not reflect Congressional acquiescence in the NFL's signal penetration rule, and the cases construing the exemption involve championship games or viewers' rights. *E.g., Hertel v. City of Pontiac*, 470 F.Supp. 603 (E.D. Mich.1979) (equal protection challenge by viewers of 75-mile blackout); *Blaich v. National Football League*, 212 F.Supp. 319 (S.D.N.Y.1962) (blackout of championship game permissible). In addition to ignoring principles of statutory construction, the district court ignored facts contemporaneous with the statute's enactment that support the station location interpretation. For example, Congress specifically utilized a station location rule in giving blackout protection to college football. 15 U.S.C.A. § 1293. The legislative history indicates that Congress intended to codify Judge Grim's 1953 decree sanctioning the NFL's then existing blackout rule which was based on station location.

In response the defendant argues along the following lines. The 1953 antitrust case did not question the fundamental property right of NFL member clubs not to authorize telecasting of their games in the area where they are attempting to sell tickets. Instead, the issue was the reasonableness of anti-competitive agreements among clubs not to televise their games in the home territories of other clubs. The statute enacted in 1961 was intended to permit NFL clubs to pool their television rights and sell them to a single network by exempting such joint sales from the antitrust laws. Reception of a television station's signal rather than the location of a television transmitter was the key in Judge Grim's decision and in discussion of the statute because both focussed on viewing of game telecasts. Since the passage of the statute, Congress and the Justice Department have repeatedly been made aware of the NFL's practice of keying on signal penetration. Proposals to amend the statute to make it turn on station location have twice been offered and were rejected both times. Government acquiescence in the NFL's signal penetration policy confirms the district court's construction of § 1292. In any event, the statute is merely confirmation of the NFL's television rights and not an antitrust exemption. Assuming § 1291 is an antitrust exemption, precedent does not mandate that it be given the narrowest possible interpretation. *See Abbott Laboratories v. Portland Retail Druggists Association*, 425 U.S. 1, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976) (Supreme Court adopted a broader reading of statutory exemption than court of appeals). Plaintiff's contention that the express reference in § 1293 to station location in protecting intercollegiate and interscholastic football games from telecasts of professional football games cuts both ways. Just as Congress may have intended the same interpretation but used different language, so too may Congress have used different language to indicate a different interpretation.

We accept the defendants' arguments as leading to the sounder conclusion. Despite the lack of clear Congressional intent, the purpose of the statute is clear. The broadcast exemption from the antitrust laws was intended to preserve the existence of the NFL by shielding its member clubs from a

decline in game attendance due to televising games in the area from which spectators are drawn. The extent of the shield depends on whether station location or signal penetration is used to measure televising within a club's home territory. Technological advances have made the distinction important because it is now possible for a station such as WTVX to be physically located well outside the prescribed area yet transmit its signal into the home territory. These same technological advances could undermine completely the purpose of § 1292 if the exemption is applied only to restrictions on stations physically located within the 75-mile radius that is designated home territory. Congressional purpose requires that the antitrust exemption focus on where the potential ticket buyers would receive the signal, not where it comes from.

AFFIRMED.