**HAWKEYE FOODSERVICE DISTRIBUTION INC.,**
Plaintiff,

v.

**MARTIN BROTHERS DISTRIBUTING COMPANY, INC.; Iowa Educators Corporation d/b/a Iowa Educators Consortium; and Daniel Dreyer, Defendants.**

No. 3:10–cv–161 RP–TJS.

United States District Court,
S.D. Iowa,
Davenport Division.

April 2, 2012.

Stephen R. Eckley, David Wayne Nelmark, Belin McCormick, P.C., William B. Ortman, Weinhardt & Logan PC, Lance Winfield Lange, Faegre Baker Daniels LLP, Des Moines, IA, for Plaintiff.

Stephen J. Holtman, Leonard T. Strand, Iris E. Muchmore, Simmons Perrine Moyer & Bergman PLC, Cedar Rapids, IA, Emily E. Chow, Richard A. Duncan, Faegre Baker Daniels LLP, Minneapolis, MN, Sarah Elizabeth Crane, Deborah M. Tharnish, Davis Brown Koehn Shors & Roberts PC, Bradley M. Beaman, John C. Cortesio, Jr., Todd A. Strother, Bradshaw Fowler Proctor & Fairgrave, Kimberly J. Walker, Faegre Baker Daniels LLP, Des Moines, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Currently before the Court is a motion for partial summary judgment filed by Iowa Educators Corporation ("IEC") and Daniel Dreyer ("Dreyer") (collectively "Defendants") on October 28, 2011. Clerk's No. 70. Martin Brothers Distributing Co. ("Martin Brothers") filed a "Joinder in Part I" of the motion on October 28, 2011. Clerk's No. 71. Hawkeye Foodservice Distribution Inc. ("Hawkeye") filed a response in opposition to the motion on December 12, 2011. Clerk's No. 75. Defendants filed a reply on December 22, 2011. Clerk's No. 76. The matter is fully submitted.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed unless otherwise noted. "In approximately 1999, the Iowa Area Education Agencies ('AEAs') formed an unincorporated organization called the Food Service Cooperative for Iowa Schools ('FSCIS')." Defs.' Facts ¶ 1. FSCIS's primary function "was to offer a voluntary purchasing program for K–12 schools through which schools could obtain low prices from foodservice vendors." *Id.* ¶ 2. In 1999, FSCIS selected Martin Brothers as "the prime distributor for sales of foodservice to [member] schools." *Id.* ¶ 3.

"In 2000, the AEAs formed ... IEC as a tax-exempt, nonprofit institution to continue the function of the FSCIS." *Id.* ¶ 4. Oversight for IEC was provided "by an Operations Committee composed of members from the AEAs across Iowa." *Id.* ¶ 5. Dreyer was hired as the Director of IEC in 2002. *See id.* ¶ 6.

From 1999 through 2010, FSCIS and IEC assisted schools with the purchase of foodservice, among other things. *Id.* ¶ 7. It did so "by negotiating at times with foodservice vendors to obtain lower food prices for Iowa schools." *Id.* ¶ 14. It also "select[ed] a prime distributor for sales of foodservice ... to IEC member schools." *Id.* "Through bidding processes in 2002 and 2007, ... IEC selected ... Martin Brothers to act as the prime distributor for sales of foodservice by vendors to IEC member schools."[2] *Id.* ¶ 15. "As the prime distributor, Martin Brothers purchased food items from manufacturers and resold those food items to IEC member schools." *Id.* ¶ 16. "Martin Brothers passed on the discounts to schools when it sold the food items for use in school lunch programs." *Id.* ¶ 17.

In 2011, IEC "ceased its foodservice program" and "the AEAs created the Iowa Association for Education Purchasing ('IAEP') ... to assist member schools with the purchase of products and services." *Id.* ¶¶ 8–9. IEC member schools "agreed to purchase 60% of their foodservice supplies from the prime distributor selected by the IEC." *Id.* ¶ 11. Between 2006 and 2011, all K–12 Iowa schools "that elected to become IEC members were nonprofit institutions," except for one. *Id.* ¶ 12. "[N]either the IEC nor Dreyer ever purchased any of the food items or foodservice." *Id.* ¶ 18.

---

1. All of the parties have requested oral argument; however, the Court does not believe that oral argument would be helpful in the resolution of this motion. The parties' requests are, therefore, denied.

2. Hawkeye asserts that " 'a bidding process' was not used to select a prime distributor in each instance that one was chosen" but does not specifically challenge Defendants' assertion that it used a bidding process in these two specific instances. *See* Pl.'s Resp. to Defs.' Facts ¶ 14.

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed.R.Civ.P. 56(a). Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is therefore entitled to judgment as a matter of law. *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). Thus, summary judgment can be entered against a party that fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir.1992); *see also* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

In resolving a motion for summary judgment, the Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y.1975)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505.

## III. ANALYSIS

In Count I, Hawkeye alleges that Defendants induced or received discriminatory pricing from food manufacturers in violation of § 2(f) of the Robinson–Patman Act, 15 U.S.C. § 13(f). Compl. ¶ 103. Section 2(f) provides: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f).

Defendants argue that Count I must be dismissed, in whole or in part, for two reasons: (1) "[t]he Nonprofit Institutions Act immunizes the entire purchasing transaction[s]" at issue, and (2) § 2(f) does not cover IEC and Dreyer because they were not "buyers" in the transactions at issue. Mot. at 1. The Court will discuss each of these arguments in turn.

### A. *Nonprofit Institutions Act*

Defendants argue that "Count I must be dismissed as to all defendants because the transactions are immune under" the Non-

profit Institutions Act ("NIA"). Defs.' Br. at 1 (Clerk's No. 70). The NIA provides an exemption from the Robinson–Patman Act for "purchases of their supplies for their own use by schools, colleges, universities, public libraries, churches, hospitals, and charitable institutions not operated for profit." 15 U.S.C. § 13c. Defendants argue that "[b]ecause the purpose of the NIA is to ensure that persons will not be discouraged from providing 'price favors' to nonprofit organizations, the NIA would be meaningless if it protected only the exempt entity but not other persons involved in the transaction who were responsible for the price favors." Defs.' Br. at 4 (internal citation omitted). Defendants further assert "that the NIA [must] immunize[ ] the parties in the vertical chain of the transaction from manufacturer to nonprofit user"; otherwise, "[t]he persons actually responsible for giving 'price favors' to schools would be discouraged from doing so [because] it would subject them to liability for price discrimination." *Id.*

■ As a general principle, "antitrust laws, and Robinson–Patman in particular, are to be construed liberally, and . . . exceptions from their application are to be construed strictly." *Abbott Labs. v. Portland Retail Druggists Assoc.*, 425 U.S. 1, 11, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976). "Implied antitrust immunity is not favored." *Id.* at 12, 96 S.Ct. 1305 (citing *United States v. Nat'l Ass'n Secs. Dealers*, 422 U.S. 694, 719, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975)). Indeed, "there is a heavy presumption against implicit (antitrust) exemptions." *Id.* (quoting *Goldfarb v. Va. State Bar*, 421 U.S. 773, 787, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (internal quotation mark omitted)).

■ The plain text of the NIA provides that purchases are exempt from Robinson–Patman Act liability if they: (1) are made by a nonprofit institution; and (2) involve the purchase of supplies for the nonprofit's own use. *See* 15 U.S.C. § 13c. When a purchase meets these two requirements, the NIA grants immunity to both the buyer and the seller. *See Burge v. Bryant Pub. Sch. Dist.*, 520 F.Supp. 328, 332 (E.D.Ark.1980); *see also Logan Lanes, Inc. v. Brunswick Corp.*, 378 F.2d 212, 215–16 (9th Cir.1967) (noting that the NIA's exception would "illusory if only the purchasing institution, but not the sellers thereto, were exempted" because this would discourage sellers from giving "nonprofit institutions the benefit of a lower [discriminatory] price").

■ In this case, Hawkeye alleges the purchases Martin Brothers made from food manufacturers violated § 2(f) of the Robinson–Patman Act. Compl. at 23–24. In these transactions, the buyer is a for-profit institution and did not purchase the supplies for its "own use." Therefore, the transactions at issue do not satisfy either of the NIA's express requirements.[3] *See* 15 U.S.C. § 13c. The Court finds this fact to be particularly important in light of the fact that exceptions to antitrust liability, such as the NIA, must be construed narrowly.

Moreover, Defendants have not provided any support—or any satisfying explana-

---

**3.** Defendants also argue that the transactions are exempt because the IEC was inducing lower prices for its "own use." Defs.' Br. at 7 (citing *De Modena v. Kaiser Found. Health Plan, Inc.*, 743 F.2d 1388, 1390–93 (9th Cir. 1984)). However, this argument overlooks the plain text of the NIA, which does not exempt all purchases *involving* a nonprofit but, rather, provides a limited exemption for "purchases of their supplies for their own use by [nonprofits]." *See* 15 U.S.C. § 13c. As Defendants do not contend that the IEC made the purchases in the transactions at issue, the IEC's nonprofit status is irrelevant to the Court's determination as to whether the NIA exempts these transactions.

tion—for their assertion that the NIA must immunize all of the parties in "the vertical chain ... from manufacturer to nonprofit user" in order to serve the purposes of the NIA. *See* Defs.' Br. at 4. Defendants have not even explained why immunizing Martin Brothers would be necessary to advance the policy goals of the NIA in this particular case. For example, Defendants have not pointed to any reason why—let alone evidence supporting a suggestions that—denying NIA immunity to Martin Brothers would deter food vendors from negotiating favorable prices with the IEC. For all of these reasons, Defendants have failed to demonstrate that they are entitled to judgment as a matter of law on Count I due to the NIA.

### B. *Section 2(f) Liability*

Defendants also contend that "Count I must be dismissed as to IEC and Dreyer because there is no liability under Section 2(f) of the Robinson–Patman Act except that of a buyer," Defs.' Br. at 8, "and neither IEC nor Dreyer were buyers in the transactions at issue," Mot. at 1. Defendants contend that § 2(f) liability must only extend to buyers because numerous cases have applied § 2(f) to buyers and there is not "a single case" extending this liability to anyone other than a buyer. Defs.' Br. at 10 (citing, among eight other cases, *Great Atl. & Pac. Tea Co., Inc. v. F.T.C.*, 440 U.S. 69, 76–81, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979)).

■ Defendants' argument fails for two reasons. First, the plain text of § 2(f) does not limit its applicability to "buyers"; rather, it expressly applies to "*any person*

engaged in commerce." *See* 15 U.S.C. § 13(f). Second, Defendants have failed to cite any case law that supports its assertion that § 2(f) applies *only* to buyers.

Although Defendants have cited numerous authorities that use the word "buyers" or involve findings of liability against "buyers," Defendants have failed to cite any cases where a court has actually considered the issue of whether a person who is *not* a buyer may be held liable under § 2(f). *See* Defs.' Br. at 10 n.3 (citing, *inter alia, Automatic Canteen Co. of Am. v. Fed. Trade Comm'n,* 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953)). For example, in *Great Atlantic,* although the Supreme Court emphasized § 2(f)'s applicability to buyers, it did so in order to distinguish § 2(f) from other sections of the Robinson–Patman Act which "prohibited only seller activity." *See* 440 U.S. at 76, 99 S.Ct. 925.

Additionally, contrary to Defendants' suggestion, the apparent lack of case law holding that § 2(f) *does* apply to persons other than buyers is not dispositive. At most, this indicates that courts have not been presented with the opportunity to address this issue. *Cf. City of St. Louis v. Am. Tobacco Co.,* 70 F.Supp.2d 1008, 1015 (E.D.Mo.1999) ("The absence of any ... case law on this subject does not suggest either that ... courts have rejected ... or ... recognized such a ground for recovery. Instead, the lack of case law indicates that ... courts have yet to consider the issue.").[4] Indeed, it appear that the instant case presents an unusual set of allega-

---

4. Defendants also attempt to argue that *American News Co. v. FTC,* 300 F.2d 104, 111 (2d Cir.1962), "is analogous here insofar as the Federal Trade Commission sought unsuccessfully to prohibit buyer inducement of discriminatory promotional allowances." Defs.' Br. at 11. In *American News,* the Second Circuit held, in relevant part, that the FTC could not

issue an order forbidding "an attempt to induce ... illegal payments without receipt thereof" because the facts in the proceedings before the FTC did not present that issue. 300 F.2d at 111. The Second Circuit explained that the FTC's order was "too broadly drawn" and passed on the opportunity to address the merits of the FTC's decision. *Id.*

tions—i.e., that one organization induced a seller to provide discriminatory pricing to another separate organization. For all of these reasons, Defendants have failed to demonstrate that they are entitled to judgment as a matter of law on Count I because IEC and Dreyer are not "buyers."

## IV.  CONCLUSION

For all of the foregoing reasons, the Court DENIES Defendants' motions for partial summary judgment on Count I.

IT IS SO ORDERED.

