IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 22, 2016 Session

# ACCREDO HEALTH GROUP INC. v. GLAXOSMITHKLINE LLC F/K/A SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE

**Appeal from the Circuit Court for Shelby County**

**No. CT00448712    Rhynette N. Hurd, Judge**

_____

**No. W2015-01970-COA-R9-CV – Filed August 3, 2016**

_____

The plaintiff purchaser of pharmaceuticals brought suit against the defendant manufacturer of the pharmaceutical for failure to provide discounted pricing based on the parties' contract. The defendant filed a motion for partial summary judgment based on the issue of contract interpretation. The trial court granted the defendant's motion. The plaintiff requested permission for this interlocutory appeal challenging the trial court's interpretation of the parties' contract. Discerning no error, we affirm.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which KENNY ARMSTRONG, J., and WILLIAM B. ACREE, SP. J., joined.

Justin L. Jones and Jennifer Ziegenhorn, Memphis, Tennessee, and Melissa Z. Baris and Thomas M. Dee, St. Louis, Missouri, for the appellant, Accredo Health Group, Inc.

Glen G. Reid, Jr., and Amber D. Floyd, Memphis, Tennessee, and Lorenzo E. Gasparetti, Raymond A. Cardozo, and Monica M. Ortiz, Los Angeles, California, for the appellee, GlaxoSmithKline, LLC f/k/a SmithKline Beecham Corp. d/b/a GlaxoSmithKline.

## OPINION

### BACKGROUND

Plaintiff/Appellant Accredo Health Group, Inc. ("Accredo") dispenses[1] specialty pharmaceuticals to patients and is licensed in Tennessee as a home health care entity. Defendant/Appellee GlaxoSmithKline, LLC ("GSK") manufactures Arixtra, a specialty pharmaceutical. Accredo is a member of a Group Purchasing Organization ("GPO")[2]. Buyers of pharmaceutical products, such as Accredo, often join GPOs, which then in turn negotiate for certain discounts on pharmaceuticals for the buyers. GSK entered into a Pharmacy Supplier Agreement with Accredo's GPO, pursuant to which the GPO's member companies were entitled to discounted prices on various pharmaceuticals, including Arixtra.

## The Parties' Agreement

### *Pharmacy Supplier Agreement*

The parties' agreement encompasses multiple documents executed over the course of several years. To begin, in 2003, GSK and the GPO entered into a Pharmacy Supplier Agreement, which was subsequently renewed in 2007.[3] The Pharmacy Supplier Agreement details the relationship between the parties, including other GPOs, GSK, and Accredo, as a member of the GPO. The Pharmacy Supplier Agreement provides that Accredo is a third party beneficiary, which the parties do not dispute.

### *Declaration Forms*

A GPO member's (here, Accredo's) ability to receive discounted pricing is based, in part, on the manufacturer's approval. Approval of a member's eligibility stems from its completion of a relevant Declaration Form. To initiate the individual approval process, Accredo submitted Declaration Forms to GSK.

---

[1] The parties dispute the method by which Accredo dispensed Arixtra. GSK asserts that Accredo is a mail order pharmacy while Accredo contends that it provides home health care to its patients and also operates a "specialty pharmacy."

[2] The agreement at issue involves multiple GPOs acting on behalf of Accredo as agents. However, they are owned by a single entity. In addition, at least one has changed its name since the execution of the agreement at issue. To avoid confusion, and because the specific name of the GPO at issue in this case is not relevant, we simply refer to these organizations collectively as "the GPO."

[3] There is little substantive difference between the 2003 and 2007 versions.

In 2006, Accredo submitted a Declaration Form ("2006 Declaration Form") to GSK designating its business type as "Home Health Care/Home Infusion."[4] In 2010, Accredo executed a similar Declaration Form ("2010 Declaration Form"). Again, Accredo indicated that its business type was "Home Health Care/Home Infusion." However, unlike the 2006 Declaration Form, the 2010 Declaration Form included an asterisk next to the business type designation which directed to a handwritten note at the bottom of the page. The handwritten notes provides: "All purchases of GSK products under this agreement will be exclusively for use by our patients under the designated class of trade, and will not be used for dispensing within the retail class of trade." Both the 2006 and 2010 Declaration Forms indicate that Accredo:

> agree[d] that any [GSK] product purchased under any agreement shall be for its 'Own Use,' as defined by the United States Supreme Court [in] ***Abbott Laboratories v. Portland Retail Druggist Association, Inc.***, 425 U.S. 1 (1976) and ***Jefferson County Pharmaceutical Association, Inc. v. Abbott Laboratories, Inc.***, 102 S.Ct. 1011 (1983).

The 2010 Declaration additionally included a parenthetical after the citation to the ***Jefferson County*** case, which stated, "(*eg* resale to Facility's patients only)."

*The Alternate Care Contract*

In April 2005, the Pharmacy Supplier Agreement was amended by the addition of another document, the Alternate Care Contract.[5] The Alternate Care Contract indicates that its purpose is to alter one of the original documents attached as an exhibit to the Pharmacy Supplier Agreement.[6] The Alternate Care Contract defines "Participating Facilities" as

> hospitals or other health care entities which meet the eligibility requirements set forth in Eligibility Exhibit B, Tables 1 through 4 and have entered into an agreement with [the GPO] through which each such institution designates

---

[4] The parties dispute whether GSK approved Accredo's 2006 Declaration Form. However, in this appeal, we are charged only with interpreting the language of the parties' agreements, including the Declaration Form, not deciding whether it was binding.

[5] The Alternative Care Contract was actually executed in February 2005, but indicated it would not be effective until that April.

[6] The parties do not dispute the validity of the Alternate Care Contract's effect on the Pharmacy Supplier Agreement. The amended provisions are substantially similar to the original. For purposes of this appeal, however, the amended version is the operative version.

3

[the GPO] as its agent for negotiating pharmaceutical purchases and each of which has been found eligible by GSK pursuant [to] this Agreement.

The Alternate Care Contract continues to a section titled "Participating Facility Eligibility," which provides:

Eligible Members shall include Non-Acute (Alternate Care) trade classes that are in good standing with GSK currently identifying [the GPO] as their primary group affiliation. The Eligible Members of Alternate Care include:

. . .

Home Health Care

. . .

In addition to the eligible trade classes, the Alternate Care Contract provides that eligibility is based on several additional requirements stating in a subsequent section titled "Eligibility." This section provides:

GSK will determine the eligibility of the Participating Facility utilizing the following requirements. GSK may determine that a Participating Facility shall no longer be eligible as a Participating Facility under this Agreement if any of the following requirements for eligibility are no longer met.
i) Must have an in-house/in-patient pharmacy, which dispenses to Participating Facility's patients only;
ii) Must employ a staff pharmacist, which may include physician dispensing unit;
iii) Must have dispensations limited to prescriptions by physicians employed by or on the professional staff of the Participating Facility; [and]
iv) Must report all discounts received pursuant to this Agreement as may be required under 42 CFR § 1001.952 (h) .
. . .

**Procedural History**

After executing the 2006 Declaration Form,[7] Accredo began purchasing Arixtra from GSK[8] on or about January 1, 2007, until May 16, 2010. According to Accredo, GSK

---

[7] Whether GSK ever received or approved Accredo's 2006 Declaration Form remains a disputed issue not within the scope of this appeal.

[8] The record indicates that Accredo purchased the drug from a wholesale supplier who had an agreement with GSK to provide the discount to certain approved buyers. Thus, while the details of this arrangement are not relevant to appeal, we note that this third party was involved in the buying and selling of the drug.

4

did not provide the discounted pricing during this time period. Still, in 2010, Accredo executed the 2010 Declaration Form, and from May 17, 2010 to June 28, 2012, Accredo received discounted pricing on its purchases of Arixtra. On June 28, 2012, GSK terminated Accredo's participation under the Agreement.

Accredo filed this lawsuit against GSK alleging several causes of action, including breach of contract, promissory estoppel, and unjust enrichment. Accredo's allegations stemmed from GSK's alleged failure to provide the discount pricing under the Agreement from January 1, 2007, until May 17, 2010, and after June 28, 2012. GSK filed a counterclaim for breach of contract, intentional misrepresentation, unjust enrichment, and promissory estoppel. GSK sought to recover the total amount of discounts that GSK granted Accredo under the Agreement between May 17, 2010, and June 28, 2012.

On January 26, 2015, GSK filed a motion for partial summary judgment asking the trial court to interpret the parties' contract and find that Accredo was not entitled to any discount under the parties' agreement. GSK argued that the term "Own Use" was limited to the use of Arixtra by Accredo in the delivery of "home health care" to its patients. GSK argued that "home health care" meant that Accredo was only entitled to discounts when it administered the drug during the provision of health services in its patients' homes.

On February 18, 2015, Accredo filed its own motion for summary judgment on its breach of contract claim. Accredo also requested that the trial court examine and interpret the parties' agreement "based solely on its four corners." Accredo subsequently filed a motion for discovery to respond to the motion for summary judgment but its request was denied by the trial court via written order entered April 13, 2015.

On January 7, 2015, the trial court purportedly entered an order granting GSK's motion for partial summary judgment and determining the meaning of "Own Use" and "Home Health Care" under the parties' agreement.[9] The trial court found that the terms "Own Use" and "Home Health Care" were not ambiguous. Regarding "Own Use," the trial court found that "if Accredo had no connection to the patient, other than selling the patient Arixtra and helping the patient manage the drug providing no care unrelated to administering the drug, the drug is not for Accredo's own use." For this contention, the trial court relied upon the test articulated in *Abbott Laboratories*. It appears that the trial court found that some of Accredo's patients, at some point, were no longer receiving care other than that related to the administration of Arixtra. Thus, Accredo was not using Arixtra for its "Own Use."  With respect to "Home Health Care," the trial court held that simply managing the dispensation of Arixtra in a patient's home did not qualify as "Home Health Care." It is important to note that the trial court's ruling only expounded

---

[9] The trial court did not rule upon Accredo's motion for summary judgment at this point.

upon the definitions of the two terms and not whether Accredo's conduct fell within either of the proffered definitions.

The trial court subsequently granted Accredo's motion for permission to file an interlocutory appeal and stayed the lawsuit, by order entered September 29, 2015. On November 2, 2015, this Court granted Accredo's application for interlocutory appeal.

## ISSUE[10]

This interlocutory appeal is limited to one issue, as stated in Accredo's petition for interlocutory appeal: "Did the trial court err in interpreting the meaning of the terms "home health care" and "own use," as used in the parties' contract document and as defined by the United States Supreme Court in *Abbott Labs*, as a matter of law?"

## STANDARD OF REVIEW

Summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts. Tenn. R. Civ. P. 56.04. In cases where the moving party does not bear the burden of proof at trial, the movant may obtain summary judgment if it:

> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. § 20-16-101 (applying to cases filed after July 1, 2011); *see also Rye v. Women's Care Ctr. of Memphis, MPLLC*, --- S.W.3d ---, 2015 WL 6457768, at *22

---

[10] In a typical interlocutory appeal, the issue is defined by the trial court and then possibly redefined by the appellate court. In this case, however, neither the trial court nor this Court defined the issue constituting the parameters for this interlocutory appeal. As such, we are constrained to review the issue decided by the trial court and designated as an issue in Accredo's Rule 9 Application. *Mallicoat v. Poynter*, 722 S.W.2d 681, 682 (Tenn. Ct. App. 1986), *perm. app. denied* (Tenn. Dec. 29, 1986) ("The jurisdiction of [the Court of Appeals] is appellate only . . . ."); *In re Adoption of E.N.R.*, 42 S.W.3d 26, 30–31 (Tenn. 2001) (declining to decide issue where record provided no indication that the trial court had disposed of the issue).

To this end, aspects of Accredo's argument concern whether its conduct fell within the scope of the language in the agreement. We decline to entertain this issue as it was neither raised in Accredo's Rule 9 application for interlocutory appeal nor ruled upon by the trial court. *Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App.2011) (holding that party waived an issue by his failure to designate it as an issue in his statement of the issues).

(Tenn. Oct. 26, 2015) (judicially adopting a summary judgment parallel to the statutory version contained in Tenn. Code Ann. § 20-16-101). When the moving party has made a properly supported motion, the "burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists." *Id.* at 5; *see Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). The nonmoving party may not simply rest upon the pleadings but must offer proof by affidavits or other discovery materials to show that there is a genuine issue for trial. Tenn. R. Civ. P. 56.06. If the nonmoving party "does not so respond, summary judgment, if appropriate, shall be entered." Tenn. R. Civ. P. 56.06.

On appeal, this Court reviews a trial court's grant of summary judgment *de novo* with no presumption of correctness. *See City of Tullahoma v. Bedford Cnty.*, 938 S.W.2d 408, 412 (Tenn. 1997). In reviewing the trial court's decision, we must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox. Cnty. Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

### RECORD ON APPEAL

As an initial matter, this Court must address several deficiencies in the parties' preparation of the record on appeal. To begin, although the order appealed is attached to a later pleading filed by GSK, the technical record omits an individual entry of the trial court's order granting partial summary judgment to GSK. However, even more glaringly, the trial court's order does not indicate that it was ever entered by the trial court because it lacks a file stamp.[11]

---

[11] Rule 58 explains that entry of a judgment or an order of final disposition is effective when marked on the face by the clerk as filed for entry, so long as it contains one of the following:

    (1) the signatures of the judge and all parties or counsel, or

    (2) the signatures of the judge and one party or counsel with a certificate of counsel that a copy of the proposed order has been served on all other parties or counsel, or

    (3) the signature of the judge and a certificate of the clerk that a copy has been served on all other parties or counsel.
    Following entry of judgment the clerk shall make appropriate docket notations and shall copy the judgment on the minutes, but failure to do so will not affect validity of the entry of judgment. When requested by counsel or pro se parties, the clerk shall forthwith mail or deliver a copy

7

Accredo filed its designation of the record on appeal on November 12, 2015. In its designation, Accredo properly designated the trial court's order granting partial summary judgment to be included in the record on appeal. The trial court clerk is not required to notify the parties before transmitting the record to this Court. However, Tennessee Rule of Appellate Procedure 24(e) provides a mechanism by which the parties can seek to correct any errors in the record, which neither party in this case sought to utilize. It is troublesome to this Court that neither of the parties in this case, despite being represented by sophisticated counsel, raised the fact that the order appealed was never actually filed in the trial record as a concern, as each parties' brief references the order at issue.

Additionally, the record in this case consists of over thirty volumes of technical record spanning well over 3,000 pages. However, having thoroughly reviewed the record, we note that the parties failed to cull the record to omit needless or repetitive documents. The myriad documents comprising the parties' agreement at issue appear several times throughout the technical record. For example, the 2006 Declaration Form appears at least five times, the 2010 Declaration Form appears at least eight times, and the Pharmacy Supplier Agreement appears at least eight times. Such repetition is unnecessary. In addition, a copy of GSK's "factbook" unnecessarily appears at least three times. The record also includes documents irrelevant to the issue at bar, such as certain discovery, scheduling order documents, and various notices. Indeed, the record includes filings subsequent to the appealed order in this case that have no bearing on this appeal.

The Court also recognizes that Rule 28 of the Tennessee Rule of Appellate Procedure permits the parties to assemble appendices that "shall contain: (1) any relevant portions of the pleadings, charge, findings or opinion; (2) the judgment, order or decision in question; and (3) any other parts of the record as the appellant deems essential for the judges to read in order to determine the issues presented." Accredo filed with its brief an 850 page appendix in accordance with Rule 28. Accredo's brief includes citations primarily to this appendix and not to the record. Indeed, the fact that Accredo relies primarily on documents within the appendix demonstrates that it has deemed only these documents relevant to the issue on appeal. We are troubled by the fact that the parties clearly view only approximately one-third of the documents contained in the record as pertinent to the issues on appeal, yet ask this Court to painstakingly review all of the documents to dispose of this appeal. In fact, when questioned by this Court at oral argument about the vastness of the record, the parties assured this Court that the entire

of the entered judgment to all parties or counsel. If the clerk fails to forthwith mail or deliver, a party prejudiced by that failure may seek relief under Rule 60.

However, by its nature, Rule 9 of the Tennessee Rules of Appellate Procedure, which governs interlocutory appeals, does not require a final order. Still, parties should endeavor to ensure that the judgment appealed from, even in an interlocutory appeal, is still marked as filed for entry by the clerk.

record was necessary for review. While this Court recognizes that attorneys are risk averse by nature and may, in good faith, deem superfluous documents to be relevant, the vast difference in the size of Accredo's appendix and the record demonstrates the record clearly includes entirely more documents than the parties had deemed relevant. That is, the parties[12] have moved past the point of being risk averse, and instead, have provided this Court with an unnecessarily burdensome record. This Court cannot condone such practice.

In the interest of judicial economy, this Court exercises its discretion to consider the merits of this appeal despite the foregoing deficiencies. Tenn. R. App. P. 2. However, we caution litigants to consider the implications of their decisions when creating the record on appeal, as we may not be so forgiving in the future.

## DISCUSSION[13]

The salient issue in this case concerns the proper interpretation of the contract between the parties, specifically the meaning of the terms "own use" and "home health care." When a contract is not ambiguous, its interpretation is a question of law that is appropriate for summary judgment. ***Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton***, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012) ("Questions of contract interpretation are generally considered to be questions of law, and thus are especially well-suited for resolution by summary judgment.") (citing ***Ross Prods. Div. Abbott Labs. v. State***, No. M2006-01113-COA-R3-CV, 2007 WL 4322016, at *2 (Tenn. Ct. App. Dec. 5, 2007), *perm. app. denied* (Tenn. Apr. 28, 2008)). When parties reduce their agreement to writing, the law favors enforcing these agreements as written. ***Bob Pearsall Motors***, 521 S.W.2d at 580. Stated another way, the court, when interpreting a contract, "does not attempt to ascertain the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written." ***Union Planters Nat'l Bank v. Amer. Home Assur. Co.***, 865 S.W.2d 907, 912 (Tenn. Ct.

---

[12] This Court uses the plural form to admonish the role Appellees played in the failure to properly designate the appellate record as well. The Tennessee Rules of Appellate Procedure governing the preparation of the appellate record assign duties to both the appellant and appellee.

[13] In the argument section of its brief to this Court, Accredo argues that the Declaration Forms are not part-and-parcel of the parties' overarching agreement. We decline to entertain this concern because it was not raised by Accredo as an issue in its petition for interlocutory appeal, and thus, was not the issue approved for appeal by this Court. Indeed, Accredo's statement of the issues in its Rule 9 application specifically requested that this Court interpret the meaning of the phrase "own use," a term that appears only in the Declaration Forms. Therefore, Accredo has waived any argument that the Declaration Forms are not an integrated part of the parties' agreement because it specifically asked this Court to review the Declaration Form when it requested an interpretation of the term "own use."

Based on the foregoing, this Court refers to the multiple documents making up the parties' agreement as a singular "agreement" or "contract." *See* ***Real Estate Mgmt. v. Giles***, 293 S.W.2d 596, 599 (Tenn. 1956) (holding that when an agreement consists of multiple documents, the court shall construe them with reference to others).

9

App. 1993). The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79 (Tenn. Ct. App. 1983); *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1978).

Where a contract is unambiguous, the court may not look beyond the four corners of the contract to ascertain the parties' intention. *Rogers v. First Tenn. Bank Nat'l Ass'n*, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987); *Bokor v. Holder*, 722 S.W.3d 676, 679 (Tenn. Ct. App. 1986). Each provision must be construed in light of the entire agreement, and the language in each provision must be given its natural and ordinary meaning. *Buettner v. Buettner*, 183 S.W.3d 354, 359 (Tenn. Ct. App. 2005).

Here, in addition to arguing that the trial court's interpretation is erroneous, Accredo argues that the trial court erred in failing to consider parol evidence. It is well settled in Tennessee that where the terms of an agreement are unambiguous, the parol evidence rule bars extraneous evidence used "to alter, vary, or qualify the plain meaning of an unambiguous written contract." *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005) (quoting *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990)). "The parol evidence rule serves to secure the integrity of contracts and to guard against fraud by a party who agrees to the unambiguous terms of a written agreement and then seeks to disavow those terms through extrinsic evidence." *Textron Fin. Corp. v. Powell*, No. M2001-02588-COA-R3-CV, 2002 WL 31249913, at \*3–\*4 (Tenn. Ct. App. 2002) (citing 32A C.J.S. *Evidence* § 1132, § 1159 (1996); *see Tidwell v. Morgan Bldg. Sys., Inc.*, 840 S.W.2d 373, 376 (Tenn. Ct. App. 1992)). However, where a contract is ambiguous—that is, susceptible to more than one reasonable interpretation—the parties' intent cannot be determined by a literal interpretation of the language. *See Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.2d 885, 890 (Tenn. 2002). Accordingly, several exceptions to the parol evidence rule exist where a party may present evidence to show fraud, misrepresentation, mistake, and incapacity. *See Textron Fin. Corp. v. Powell*, No. M2001-02588-COA-R3-CV, 2002 WL 31249913, at \*3–\*4 (Tenn. Ct. App. 2002); *Patty v. Peery*, No. 198, 1991 WL 83329, at \*3 (Tenn. Ct. App. May 22, 1991).[14] As stated above, the parties' arguments center on the meanings of two terms that appear in the agreement. We analyze each term in turn.

We first consider the meaning of the term "own use" as used in the parties' contract. The term "own use" appears in the Declaration Forms allegedly executed and submitted by Accredo to GSK in an attempt to procure discounted pricing for its purchase

---

[14] The trial court noted that aspects of this case present a choice of law issue. Still, the trial court found that "regardless of the choice of law, we had as options, Tennessee, Texas or Delaware, the contract principles are the same." The trial court then indicated it would "not now" be making a choice of law determination. Neither party challenges on appeal the trial court's decision to proceed in this manner. For purposes of this appeal, we apply the principles of Tennessee contract law.

10

of Arixtra. As stated above, both the 2006 and 2010 Declaration Forms indicate that Accredo agreed that the pharmaceuticals purchased pursuant to any agreement would be for Accredo's "own use" as defined in ***Abbott Laboratories v. Portland Retail Druggist Association, Inc.***, 425 U.S. 1 (1976) and ***Jefferson County Pharmaceutical Association, Inc. v. Abbott Laboratories, Inc.***, 102 S.Ct. 1011 (1983). The 2010 Declaration also included a parenthetical stating "(*eg* resale to Facility's patients only)" after the ***Jefferson County*** citation.

Accredo argues that the trial court misapplied ***Abbott Laboratories*** decision to the case-at-bar and imposed additional requirements upon the interpretation of "own use" that do not appear in the parties' agreement. Specifically, Accredo claims that the trial court's rendition of "own use" would require Accredo to "deliver an in-home healthcare service to each patient in addition to managing the dispensation of Arixtra[] to its patients in their homes." From what this Court can discern of Accredo's argument, it appears to be premised on their assertion that it satisfied the requirement of "own use." Again, the issue on appeal does not concern whether Accredo met this requirement but instead the scope of the requirement. The former issue is open to future litigation. In addition, Accredo asserts that the trial court's holding amounts to a prohibition on any entity that has an intended institutional operation of dispensing drugs from meeting the "own use" requirement.

Relying upon ***Abbott Labs***, the trial court interpreted the meaning of "own use" as follows:

> [T]he first step is to determine whether the facility uses the drug. Then – if so, then the question is whether the use is part of and promotes the facility's intended operation. . . . Now, interestingly the ***Abbott Labs*** Court does contemplate that suppliers will require its customers to certify the circumstances under which they dispense the suppliers' products. The Court says, suppliers have the responsibility to identify its customers with regard to eligibility and to routinely obtain a representation from its customers as to the use of the products purchased.

The trial court continued on to explain how Declaration Forms serve this purpose. According to the trial court, Accredo would meet the definition of "own use" if it dispensed Arixtra as part of and to promote its function as a home health care entity. Thus, the term "own use" is constrained by whatever designation the buyer chose in order to be eligible for the discount.

The trial court explained its ruling further, providing that if Accredo had no connection to the patient, other than selling the drug to him or her, and not providing any form of care "unrelated to administering the drug," Accredo would not meet the

11

requirement of "own use." On the other hand, the trial court's ruling provides that, "Only if Accredo provides healthcare services in the first instance and related to those []services dispenses Arixtra as part of and to promote those healthcare services is the dispensing of Arixtra for Accredo's use." In sum, the trial court found that "own use" required Accredo to use the drug within its intended institutional operation "and not just sell the drug."

The parties' dispute over the trial court's ruling centers around the application of the decision in **Abbott Laboratories v. Portland Retail Druggists Association, Inc.**, 425 U.S. 1 (1976) (hereinafter "**Abbott Labs**"), which provides the definition of "own use" pursuant to the parties' agreement. The **Abbott Labs** case was an antitrust action brought against several manufacturers of pharmaceutical products by a non-profit corporation and assignee of over sixty commercial pharmacies. The petitioners alleged a violation of the Robinson-Patman Act, which makes price discrimination between certain purchasers unlawful where "the effect . . . may be substantially to lessen competition." 15 U.S.C. § 13a. The hospital claimed that the challenged sales of certain pharmaceuticals were exempt under the Non-Profit Institutions Act, which excludes from the application of the Robinson-Patman Act non-profit hospitals' "purchases of their supplies for their **own use**." *Id.* at § 13c.[15] The issue before the Supreme Court specifically concerned whether a non-profit hospital's use of a pharmaceutical fell within the purview of its "own use" as defined within the Non-Profit Institutions Act ("NPIA"). **Abbott Labs**, 425 U.S. at 4. Although neither the Robinson-Patman Act nor the NPIA is applicable to the case-at-bar, the Supreme Court's definition of "own use" as defined in **Abbott Labs** is.

The Supreme Court described the definition as "a limited one." *Id.* at 14. It explained that the non-profit hospital's status as a non-profit hospital "does not mean that all its purchases are exempt from Robinson-Patman"; instead, only "purchases of their supplies for their own use" would be exempt. According to the Court, "own use" is "what reasonably may be regarded as use [b]y the hospital in the sense that such use is a part of and promotes the hospital's intended institutional operation in the care of persons who are its patients." *Id.*

The Court offered examples of ten varying situations to illustrate whether conduct amounted to "own use". *Id.* at 10. To begin, the Court noted that the parties agreed that "[d]ispensation to the bed-occupying inpatient and to the patient at the hospital's emergency facility" constituted dispensation that is part of the institution's function and for its "own use." *Id.* at 14. In addition, dispensation in the form of a take-home prescription is dispensation for the hospital's own use because the hospital's contact with

---

[15] Section 13c provides:

> Nothing in the Act approved June 19, 1936, known as the Robinson-Patman Antidiscrimination Act, shall apply to purchases of their supplies for their own use by schools, colleges, universities, public libraries, churches, hospitals, and charitable institutions not operated for profit.

the patient, in the form of supervision and participation, is "continuous and real, and are distinct parts of the transition from hospital care to home care." *Id.* at 15. Thus, a continuation of or supplement to treatment that began in the hospital's facility, even if now outside the facility, is for the hospital's "own use."

Conversely, the Supreme Court also provided examples of dispensation that were not for the hospital's "own use." To this end, a refill of a product for the hospital's former patient "is on the other side of the line that divides that which is in the hospital's 'own use' from that which is not." *Id.* at 15. The Court noted that, while it may be advisable for the patient to continue use of a drug "some time after initial prescription," outside of the scope of the take-home prescription referenced above, it is still not for the hospital's own use simply because it originated "under hospital auspices." *Id.* at 15–16. At this point, the Court explained, the connection to the hospital has become too attenuated for any refill to promote its intended institutional operation as a hospital in the care of its patients. *See id.*; *id.* at 14.[16]

The final category discussed by the Court includes dispensation for "walk-in buyers." *See id.* at 17. Walk-in buyers, as explained by the Court, maintain no present connection with the hospital other than as a place that fills the buyer's prescription. Although recognizing that a modern-day hospital is a different institution than when the NPIA was enacted in 1938, the Court opined that to hold otherwise "would make the commercially advantaged hospital pharmacy just another community drug store open to all comers for prescription services and devastatingly positioned with respect to competing commercial pharmacies." *Id.* at 17–18. In sum, dispensations for walk-in buyers are not for the hospital's "own use" as contemplated by the NPIA.

The above categories and examples given by the Supreme Court demonstrate that "own use" must be related to the hospital's intended institutional function as determined by the exemption it sought. In ***Abbott Labs***, the hospital's exemption from the antitrust statute at issue resulted from its status as a non-profit hospital. *Id.* at 14. Thus, whether the non-profit hospital was entitled to the discount required it to use the product as "part of and [to] promote" the function that entitled it the discount in the first instance—i.e. its status as a non-profit hospital. *See id.* at 14. It follows then that any dispensation occurring outside of the scope of the hospital's function as a hospital, such as simply selling the product without more, was not for the hospital's "own use."

The parties' agreement also references their intention to utilize the case ***Jefferson County Pharmaceutical Association v. Abbott Laboratories***, 460 U.S. 150 (1983) and its definition of "own use." In ***Jefferson County***, the Supreme Court considered whether the

---

[16] We omit the next categories considered by the Court discussing dispensations to the hospital's employees, students, physicians, and the physician's dependents because it is not material to our analysis of this appeal. *See id.* at 16–17.

resale of pharmaceuticals by a public university medical system ("University") was exempt from the Robinson-Patman Act where the University was competing with private retail pharmacies. *See* *id.* at 151. The Supreme Court determined that this was not an exempt activity under the Robinson-Patman Act because the resale was not for the University's "own use." That is, again, in deciding the "own use" inquiry, the Supreme Court had to first determine the activity that qualified the entity for the discounted pricing in the first instance. Here, the entity relied on the exemption in 15 U.S.C. § 13c for "universities . . . not operated for profit." *Id.* at 153. Thus, the University's resale of pharmaceuticals to third parties, without more, were "not exempt from the proscriptions of the Robinson-Patman Act." *Id.* at 171. Still, the Court acknowledged that certain purchases of pharmaceuticals "for consumption in traditional governmental functions" would be exempt. Accordingly, the Court again employed a "linedrawing analysis," *see* *Abbott Labs*, 425 U.S. at 10, and ultimately concluded that the University was not entitled to discounted pricing on pharmaceuticals it simply intended to resell, as that use did not qualify as "own use" under the exemption. *Jefferson County*, 460 U.S. at 171.

In both *Abbott Labs* and *Jefferson County*, the Supreme Court did not devote much discussion to what constituted the entities' intended institutional operations. However, it is instructive that the Court analyzed what constituted "own use" by first looking at the function that exempted the entity from the Robinson-Patman Act in order to procure discounted pricing. In *Abbott Labs*, the hospital's status as a non-profit hospital entitled it to obtain discount pricing, and thus, became its intended institutional operation for purposes of determining what dispensations were for its "own use." In *Jefferson County*, certain purchases of pharmaceuticals by the public University were not exempt where not used for its intended institutional operation as a public not-for-profit university. The Supreme Court's promulgation of the varying categories in *Abbott Labs* demonstrates its emphasis on the relationship between "own use" and the status that qualified the health care entity to receive the exemption. Although a statutory exemption is not at issue in this case, the parties clearly intended that the "own use" term would be interpreted in accordance with the interpretation offered by the Supreme Court in *Abbott Labs* and *Jefferson County*. As such, we superimpose the *Abbott Labs* framework on to the issue of discounted pricing, rather than statutory exemptions. Considering the issue in this light, it is clear that Accredo's intended institutional function must stem from whatever type of entity it cited to obtain discount pricing, much the same way that the hospital in *Abbott Lab's* intended institutional function stemmed from the type of entity it claimed entitled it to a statutory exemption.

Using the categories set forth in *Abbott Labs* as guidance, our analysis must first gauge what constitutes Accredo's intended institutional operation and determine which dispensations are part of or promote that function. Like in *Abbott Labs* and *Jefferson County*, we must consider what status—that is, what intended institutional operation— entitled Accredo to discount pricing in the first instance. Both parties appear to treat this

inquiry as a threshold consideration. The parties' arguments, however, diverge where they conclude what constitutes Accredo's intended institutional operation.

Accredo asserts that its intended institutional operation is as a specialty pharmacy "to manage the dispensation of specialty pharmaceuticals to patients suffering from chronic, complex diseases, for administration in the patients' home."[17] Accredo's proposed institutional operation seeks to define "own use" as including dispensations from its specialty pharmacy.[18] Where Accredo's argument falls short, however, is its omission of any discussion of why its intended institutional operation would not be "home health care," as it indicated as its business type on both the 2006 and 2010 Declaration Forms.[19] GSK argues that Accredo's intended institutional operation is what it contractually specified in the parties' agreement in order to obtain discount pricing.

Based on the line of reasoning employed by the Supreme Court in *Abbott Labs* and *Jefferson County*, which the parties agreed to be bound by, we agree with GSK. Accredo self-declared its status as a "home health care" entity, which began the process for them to obtain the discounted pricing in the first place. We are unpersuaded by Accredo's argument that its intended institutional operation was that of a "specialty pharmacy." The parties' agreement does not contemplate discount pricing for specialty pharmacies. Indeed, in the Alternate Care Contract, a specialty pharmacy or the "managing of dispensations . . ." is not listed as one of the types of trade classes that are eligible for the discounted pricing. Accordingly, Accredo's intended institutional operation for purposes of this agreement was a "home health care" entity, and its "own use" of Arixtra was limited by this.

We next must determine the meaning of the term "home health care" as used in the parties' agreement, specifically in both of the Declaration Forms. The term "home health care" is not expressly defined in the parties' agreement. As stated above, when possible, courts should attempt to construe language in a contract in accordance with its plain and ordinary meaning. *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79 (Tenn. Ct. App. 1983); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1978). This Court's research has revealed no dictionary that includes

---

[17] Again, Accredo contends in its brief that there is "no dispute that Accredo dispensed all Arixtra[] to its patients in their homes." We note that Accredo's contention is outside the scope of review for this appeal. We offer no opinion as to what Accredo did or did not do concerning the dispensation of Arixtra. Instead, we are charged only with providing an interpretation of "own use."

[18] Accredo's argument includes citations to various federal cases all purporting to interpret and apply the Supreme Court's opinion. We find these comparisons unavailing. If the parties wished to define "own use" as defined by all federal caselaw, they should not have limited the definition to the ones promulgated in *Abbott Labs* and *Jefferson County*.

[19] Accredo also indicated that it was licensed as a home health agency, not a specialty pharmacy, in Tennessee and other states.

the full phrase "home health care." However, the individual terms "home" and "health care" both appear in the dictionary.

The term "home" means "the place where a person (or family) lives" or "one's dwelling place." *Webster's New World College Dictionary* 695 (5th ed. 2014). "Health care" is defined as "the prevention or treatment of illness or injury, esp[ecially] on a comprehensive, ongoing basis." *Id.* at 669. Similar to the terms at issue, several similar terms illuminate the appropriate meaning of "home health care." The term "home care" means "a health service provided in the patient's place of residence for the purpose of promoting, maintaining, or restoring health or minimizing the effects of illness and disability." *Mosby's Dictionary of Medicine, Nursing & Health Professions* 851 (9th ed. 2013). Similarly, a "home health agency" is "an organization that provides health care in the home." *Id.* Based on the foregoing definitions, the plain and ordinary meaning of "home health care" would include the provision of health services to prevent or treat illness or injury provided in the place where the patient lives or dwells.

Based on the foregoing, we hold that the parties' agreement entitles Accredo to discounted pricing on its purchases of Arixtra that were used for its "own use" as a "home health care" entity. That is, it is entitled to discounted pricing on Arixtra that is dispensed as part of and promoting its provision of health services to prevent or treat illness or injury provided in the place where the patient lives or dwells. However, per the plain language of the parties' agreement, the resale of Arixtra is not enough. The agreement requires Accredo to provide some service in the patients' home. The filling of an Arixtra prescription and its shipment to the patient's home is insufficient to meet this definition, even if it also includes a telephonic communication with the patient seeking to provide expertise regarding the drug. Instead, Accredo's participation with the Arixtra patient must be "continuous and real." *Abbott Labs*, 425 U.S. at 15. Although the provision of Arixtra may be "well indicated for the particular patient," it is no longer for Accredo's "own use" when the connection between the refill and Accredo's intended institutional operation as a home health care entity becomes too attenuated. Accredo must provide some sort of service in the home to make the dispensation of Arixtra for its "own use." Such service must be more than what a patient would typically receive from a brick-and-mortar retail pharmacy or mail-order pharmacy encompassing simply dispensing the medication and providing consultation if needed.

As stated by the trial court, "if home health care meant having a drug delivered to a patient's home where the patient administers it herself, perhaps, even after consultation with her pharmacist about proper use, retail pharmacies could be deemed as providing home health care."[20] To this end, as Accredo agreed to on the Declaration Form, the

---

[20] Indeed, Tennessee law defines the "practice of pharmacy" as:

simple, straightforward retail sale of Arixtra, without more, is not for its "own use." Accordingly, we agree with the trial court's ruling interpreting the parties' agreement and affirm its grant of partial summary judgment in favor of GSK.

We do not hold, however, that such service must be unrelated to the provision or administration of Arixtra, but the contract clearly requires some sort of "home health care" in order to be eligible for discounted pricing. Inasmuch as the trial court's order, however, requires a service unrelated to the administration of Arixtra, we reverse the order because such is not required by the plain language of the agreement. Accordingly, as an example, we note that if a representative of Accredo went to the patient's house, administered or provided support in the home pertaining to Arixtra, such would suffice under the agreement even though such service would be related to the dispensation or administration of the drug.

Thus, the trial court's ruling interpreting the language of the parties' agreement is hereby affirmed in part and reversed in part.

---

(39)(A) "Practice of pharmacy" means a patient-oriented health service profession in which pharmacists interact and consult with patients and other health care professionals to enhance patients' wellness, prevent illness, and optimize outcomes. The practice involves:
   (i) Interpretation, evaluation and implementation of medical orders and prescription orders;
   (ii) Responsibility for compounding and dispensing prescription orders, including radioactive substances;
   (iii) Participation in drug, dietary supplement and device selection, storage, distribution and administration;
   (iv) Drug evaluation, utilization or regimen review;
   (v) Maintenance of patient profiles and other pharmacy records;
   (vi) Provision of patient education and counseling;
   (vii) Provision of patient care services and activities pursuant to a collaborative pharmacy practice agreement;
   (viii) Drug or drug-related research; and
   (ix) Those professional acts, professional decisions or professional services necessary to maintain all areas of a patient's pharmacist-provided care[.]

The conduct suggested by Accredo that constitutes "own use"—such as telephonic consultation with the patient or dispensing Arixtra to the patient's home (i.e. delivering Arixtra to the patient's home)—does little to remove itself from the practice of pharmacy and into the realm of home health care. Without rendering an opinion as to whether Accredo's conduct actually satisfied the requirements of the contract, we point out that consultation and delivery of the drug to the patient is something already entailed in the typical practice of pharmacy according to Tennessee law. As an example, the use of the drug cannot somehow shift into "home health care" when the only difference is that the Arixtra is delivered to the patient's home instead of at a physical storefront location.

17

**Remaining Issues**

Accredo argues that the trial court erred when it decided GSK's motion for partial summary judgment based solely on the four corners of the parties' agreement without considering extrinsic evidence.[21] Because we have determined that the meanings of "own use" and "home health care" as used in the parties' agreement are unambiguous, this issue is pretermitted.

Accredo also argues that the trial court erred when it did not grant Accredo's request for additional discovery before ruling on GSK's motion for partial summary judgment. This issue was not designated as an issue in Accredo's petition requesting its Rule 9 interlocutory appeal, and therefore, was not approved for review. Thus, this issue is waived for purposes of this interlocutory appeal.

## CONCLUSION

The judgment of the Shelby County Circuit Court is affirmed in part and reversed in part. This cause is remanded to the trial court for all further proceedings as are necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellant Accredo Health Group, Inc., and its surety.

_____
J. STEVEN STAFFORD, JUDGE

---

[21] Notably, subsequent to GSK's filing of its motion for partial summary judgment, Accredo filed a motion for summary judgment on the issue of contract interpretation alleging that the contract could be interpreted solely by looking within its four corners.