**Opinion filed March 28, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00046-CV

_____

## IN RE COMMITMENT OF JOHN CLINTON IVIE

**On Appeal from the 259th District Court**
**Jones County, Texas**
**Trial Court Cause No. 025208**

### O P I N I O N

This is an appeal from a civil commitment order in which the State sought to commit Appellant, John Clinton Ivie, for treatment and supervision as a sexually violent predator pursuant to the Texas Civil Commitment of Sexually Violent Predators Act (the Act). TEX. HEALTH & SAFETY CODE ANN. ch. 841 (West 2017 & Supp. 2023). A jury found beyond a reasonable doubt that Appellant is a sexually violent predator, and the trial court entered a final judgment and commitment order committing Appellant for treatment and supervision. HEALTH & SAFETY § 841.081. In his first and second issues, Appellant contends that he was harmed when the trial

court erroneously "disregard[ed]" the fact that members of the venire panel may have seen him enter the courtroom in jail clothing, handcuffs, and shackles. In his third and fourth issues, Appellant contends the evidence was legally and factually insufficient to support the jury's sexually-violent-predator finding. We affirm.

*Background Facts*

On August 3, 2012, Appellant pleaded guilty to the second-degree felony offense of indecency with a child by sexual contact in Eastland County. *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (d) (West 2019). The trial court deferred a finding of guilt and placed Appellant on community supervision for a term of ten years.

On or about December 20, 2014, while under deferred adjudication community supervision for that offense, Appellant committed the second-degree felony offense of indecency with child by contact in Jones County. *See id.* On January 20, 2015, Appellant committed the third-degree felony offense of failure to comply with sex offender registration requirements. *See* TEX. CODE CRIM. PROC. ANN. art. 62.102 (a), (b)(2) (West 2018). Appellant pleaded guilty to both Jones County charges and was convicted for those offenses in August of 2015. The trial court sentenced Appellant to a term of ten years in the Institutional Division of the Texas Department of Criminal Justice for each conviction and ordered that the sentences run concurrently.

On June 14, 2016, after Appellant pleaded true to the State's Motion to Adjudicate Guilt, the trial court in Eastland County revoked Appellant's deferred adjudication community supervision and adjudicated Appellant guilty of indecency with a child by sexual contact. The trial court sentenced Appellant to a term of ten years in the Institutional Division of the Texas Department of Criminal Justice.

In April 2021, the State filed a petition asserting that Appellant is a sexually violent predator. *See* HEALTH & SAFETY § 841.041. Appellant's civil commitment trial followed. *See id.* § 841.061.

Before calling the case, the trial court noted on the record that Appellant's trial counsel had an objection to make outside the presence of the venire panel. The following conversation took place:

> [RESPONDENT]: I would object to the Respondent being brought into court with the jury present while he was in jail -- a jail outfit and shackles and handcuffs.

> [THE STATE]: The U.S. Supreme Court case of Self [sic] v Williams[1] essentially says that no prejudice can be seen from what the jury knows or will know. At this point, they don't know anything. This case hasn't even been called. They will find out most likely during voir dire that the Respondent is incarcerated, and I don't believe there is any prejudice that can be had. Counsel can ask if any of them were prejudiced by it and then that will remedy the issue.

> THE COURT: All right. It will be overruled at this time.

> [RESPONDENT]: We would ask for a mistrial.

> THE COURT: Mistrial is denied.

After denying Appellant's motion for mistrial, the trial court proceeded with voir dire. Appellant's trial counsel informed the venire panel that Appellant was currently incarcerated and asked a venireperson whether they would "hold it against him." When the venireperson affirmed that they would remain impartial, Appellant's trial counsel moved on to a different topic. A jury was subsequently empaneled.

The State called Dr. Jason Dunham to give his expert opinion on whether Appellant has a behavioral abnormality as defined in the SVP Act. *See* HEALTH & SAFETY § 841.002(2). Dr. Dunham is a licensed forensic psychologist with a Ph.D. in counseling psychology. He has over twenty years of experience in forensic psychology and has been conducting sex offender evaluations and risk assessments

---

[1]Appellant suggests that the State's attorney was actually referencing *Estelle v. Williams*, 425 U.S. 501 (1976).

3

in Texas since 2005. As set out below, Dr. Dunham opined that Appellant has a behavioral abnormality that renders him a sexually violent predator.

At the close of the State's case-in-chief, Appellant's trial counsel moved for a directed verdict, asserting that the State had not met its burden of proof. The State responded that it had proven that Appellant was a repeat sexually violent offender by introducing evidence of Appellant's two convictions, and it asserted that Dr. Dunham's testimony created a fact issue regarding whether Appellant had a behavioral abnormality. The trial court agreed with the State and denied Appellant's motion for directed verdict. The jury found beyond a reasonable doubt that Appellant is a sexually violent predator, and the trial court entered an order of commitment.

Appellant filed a motion for new trial and asserted, among other things, (1) that his due process rights were violated when he was brought into the courtroom wearing jail clothing, handcuffs, and shackles; and (2) that the evidence was legally and factually insufficient to support the jury's finding beyond a reasonable doubt that he is a sexually violent predator. Appellant's motion for new trial was overruled by operation of law.

*Analysis*

*Venire Panel Viewing Appellant in Jail Attire, Shackles, and Handcuffs*

In his first and second issues, Appellant contends that the trial court abused its discretion in denying his motion for mistrial after overruling his objection to being "forced" into the courtroom while restrained, and that the trial court's error harmed his defense. Appellant requests a new trial to correct the alleged error.

*Preservation*

The State responds that Appellant waived the issue because (1) Appellant's motion for mistrial was not sufficiently specific enough to make the trial court aware of his complaint, (2) Appellant's argument on appeal does not comport with the

4

motion for mistrial he made in the trial court, and (3) Appellant neither requested nor took any curative measures to prevent any harm that may have occurred.[2]

In order to preserve a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context," and that the trial court either ruled or refused to rule on the request, objection, or motion. TEX. R. APP. P. 33.1(a)(1), (2). Further, the argument presented on appeal must comport with the argument made in the trial court. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997); *Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 159 (Tex. App.—Austin 2017, pet. denied) (citing *Aero Energy, Inc. v. Circle C Drilling Co.*, 669 S.W.2d 821, 822 (Tex. 1985)).

The State first asserts that Appellant's motion for mistrial was not sufficiently specific to make the trial court aware of his complaint because his "entire motion for mistrial was, 'We would ask for a mistrial.'" However, Appellant moved for a mistrial immediately after the trial court overruled his objection to "being brought into the court with the jury present while he was in . . . a jail outfit and shackles and handcuffs." Given that his motion for mistrial immediately followed, we find that the specific grounds of Appellant's motion for mistrial were apparent from the context. *See* TEX. R. APP. P. 33.1(a)(1)(A).

The State further asserts that Appellant's contention on appeal does not comport with his motion for mistrial because he did not assert his argument about his constitutional presumption of innocence in the trial court. Appellant correctly

---

[2]We note that the State additionally asserts that "[t]here was no need for a mistrial because there was not yet even a trial." The State cites no authority in support of its proposition. For purposes of this appeal, we will assume—without deciding—that Appellant's motion for mistrial was a proper procedural vehicle, as opposed to requesting the trial court to empanel a new venire panel, for example.

notes in his reply brief that he has made no arguments regarding a constitutional presumption of innocence. In this regard, a respondent in a civil commitment hearing is not entitled to a presumption of innocence because no guilt/innocence determinations are made during the proceeding. *See In re Commitment of Fisher*, 164 S.W.3d 637, 656 (Tex. 2005) (holding that the SVP Act is civil in nature); *see also In re Commitment of Pearson*, No. 07-23-00208-CV, 2023 WL 8248052, at *1 (Tex. App.—Amarillo 2023, no pet. h.) (holding that a requested instruction modeled after the presumption of innocence applicable in criminal cases is inapplicable in a civil commitment hearing because "a civil commitment under the SVP Act is a civil matter, not a criminal trial," and the requested instruction "is not mandated by statute or by caselaw").

In summary, Appellant lodged an objection and moved for mistrial because the venire panel saw him enter the courtroom in jail clothing, handcuffs, and shackles. On appeal, Appellant asserts that the trial court's decision to overrule his objection and deny his motion for mistrial was error because "[t]he fact that civil commitment decisions are made in civil court does not relieve the trial court of [the] responsibility for ensuring that the venire panel is not influenced by visual manifestations that the court considers a litigant to be dangerous." Appellant's contention on appeal remains focused on the alleged error of allowing the venire panel to see Appellant enter the courtroom in restraints and jail attire. Therefore, Appellant's grounds for his motion for mistrial were apparent from the context and his argument on appeal comports with the motion he made in the trial court. Appellant's issue is preserved for our review. *See* TEX. R. APP. P. 33.1.

The State additionally asserts that Appellant waived his compliant because he did not request an instruction to disregard. The State cites *Young v. State* in support of its proposition that "[f]ailing to request an instruction waives appellate review when an instruction could have cured the alleged error." *See Young v. State*, 137

S.W.3d 65, 70 (Tex. Crim. App. 2004). We first note that, while some courts of appeals have applied *Young* in a civil context (including in a civil commitment case), the Supreme Court of Texas has yet to apply *Young* to any civil cases. *See, e.g.*, *In re Commitment of Hill*, 308 S.W.3d 465, 480–81 (Tex. App.—Beaumont 2010) *rev'd on other grounds*, 334 S.W.3d 226 (Tex. 2011); *S.A., Jr. v. Tex. Dep't of Family & Protective Services*, No. 03-17-00790-CV, 2018 WL 1096012, *4 (Tex. App.—Austin 2018, no pet.) (mem. op.). Regardless, the State has misconstrued the holding in *Young*. The court specifically held that a defendant may preserve error for appeal by moving for a mistrial without first making an objection and requesting an instruction to disregard:

> [T]he traditional and preferred procedure for a party to voice its complaint has been to seek them in sequence—that is, (1) to object when it is possible, (2) to request an instruction to disregard if the prejudicial event has occurred, and (3) to move for a mistrial if a party thinks an instruction to disregard was not sufficient. However, this sequence is not essential to preserve complaints for appellate review. The essential requirement is a timely, specific request that the trial court refuses.

*Young*, 137 S.W.3d at 67, 69–70 (footnote omitted). Here, while Appellant did not request an instruction to disregard, Appellant did object and move for a mistrial. Accordingly, Appellant met *Young*'s "essential requirement" for preservation as soon as he lodged his objection and obtained an adverse ruling on it. *See id.* at 69. Appellant might have limited the scope of our review to the "question [of] whether the trial court erred in not taking the most serious action of ending the trial," but, "[l]imited as this scope of appellate review may be, such an appellate review is available to such a party." *See id.* at 70.

We conclude that Appellant has sufficiently preserved his issue for our review. We now turn to the merits of Appellant's contention.

*Motion for Mistrial*

A mistrial should only be granted in "extreme circumstances" where prejudice is "incurable." *Givens v. Anderson Columbia Co.*, 608 S.W.3d 65, 71 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re E.O.E.*, 508 S.W.3d 613, 624 (Tex. App.—El Paso 2016, no pet.)). We review the denial of a motion for mistrial for an abuse of discretion. *Bazan v. Munoz*, 444 S.W.3d 110, 123 (Tex. App.—San Antonio 2014, no pet.); *Michaelski v. Wright*, 444 S.W.3d 83, 89 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Deese v. Combined Specialty Ins. Co.*, 352 S.W.3d 864, 866 (Tex. App.—Dallas 2011, no pet.); *Taveau v. Brenden*, 174 S.W.3d 873, 880 (Tex. App.—Eastland 2005, pet. denied). A trial court abuses its discretion if it acts arbitrarily or without reference to any guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012).

Appellant asserts that the trial court abused its discretion in denying his motion for mistrial because the trial court, in effect, "disregard[ed]" that the venire panel saw Appellant enter the courtroom in jail clothing, handcuffs, and shackles. Appellant further asserts that the trial court was required to make a specific finding that Appellant needed to be restrained, and that it failed to do so. Appellant cites *Deck v. Missouri* in support of his proposition. *See Deck v. Missouri*, 544 U.S. 622 (1985). In *Deck*, the Supreme Court was tasked with determining "whether shackling a convicted offender during the penalty phase of a capital case violates the Federal Constitution." *See id.* at 624. The Court first determined that, during the guilt/innocence phase of a criminal trial, "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *See id.* at 629. The Court then identified "three fundamental legal principles" to apply when determining whether to extend the "[j]udicial hostility" toward shackles to the punishment phase of a capital

proceeding: (1) shackling undermines the presumption of innocence in criminal trials; (2) the use of physical restraints diminishes a criminal defendant's ability to communicate with his attorney; and (3) the dignity of the judicial process, "which includes the respectful treatment of defendants." *See id.* at 630–32. The Court went on to hold that "[t]he considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases." *Id.* at 632.

The case before us is notably distinguishable from *Deck* in two regards. First, as we have previously noted, civil commitment proceedings are civil in nature. *See Fisher*, 164 S.W.3d at 656; *Pearson*, 2023 WL 8248052, at *1. Second, as the State notes, "there is no evidence that any juror actually saw [Appellant] in the jail clothes and shackles, or identified the man so dressed as the respondent in this civil case."

Appellant concedes that Texas courts have not yet been tasked with determining whether shackling a respondent in a civil commitment case, absent a specific trial court finding that the shackles are necessary, is an abuse of discretion. However, Texas courts have addressed situations involving civil litigants that were observed by the jury wearing jail attire and restraints. These cases provide sufficient guidance to analyze Appellant's first and second issues. As such, Appellant's reliance on *Deck* is misplaced.

*In re K.R.* is a parental termination case wherein the trial court ordered that the incarcerated father remain in handcuffs during trial over the objection of all of the trial participants. 63 S.W.3d 796, 798 (Tex. 2001). However, the trial court instructed the jury that "you're not to infer anything from the fact that he's handcuffed, other than the fact that he's been convicted of a crime which causes his incarceration." *Id.* The Texas Supreme Court noted that in the criminal context, the United States Supreme Court has admonished that shackling a criminal defendant in the sight of the jury is a "last resort," and the Court of Criminal Appeals has stated

that "shackling should be avoided 'except where there has been a showing of exceptional circumstances or a manifest need for such restraint.'" *Id.* (quoting *Illinois v. Allen*, 397 U.S. 337, 344 (1970); *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991)).

The court concluded that the trial court erred by ordering the defendant to be handcuffed during trial, but that the error was subject to a harmless error review. *Id.* at 800. The court determined that no harmful error occurred because (1) the evidence supporting termination was clear and convincing, (2) the venire panel indicated that they would not reach a decision based solely upon the father's conviction and sentence, (3) it presumed that the jury could follow the trial court's instruction and "draw no improper conclusions from seeing [the father] in handcuffs." *Id.* at 800–01 ("Nothing in the record even hints that they would have reached a different verdict had they not seen [the father] in shackles."); *see In re L.A.*, No. 02-07-00236-CV, 2008 WL 2168017, at *9–10 (Tex. App.—Fort Worth May 22, 2008, no pet.) (mem. op.) (Applying *In re K.R.* to similar facts and concluding "nothing in the record suggests that the jury would have arrived at a different verdict had they not seen [the father] in shackles and jail garb.").

*Carson v. Gomez* was a suit brought by an inmate against prison employees. 14 S.W.3d 778, 779 (Tex. App—Houston [1st Dist.] 2000, pet. denied). The inmate sought to discharge a jury panel that saw him enter the courtroom while wearing prison attire and handcuffs. *Id.* The trial court overruled the inmate's motion, but advised that it would grant the motion later if the venire panel indicated that it had been prejudiced by the inmate's appearance. *Id.* The First Court of Appeals noted that "except for good cause, no one should be *tried* while restrained, and if one is, the judge should try to minimize the potential for harm." *Id.* at 780. As noted by the court, "[a]t most, the record shows that jurors saw appellant—who testified he was an incarcerated felon—handcuffed momentarily while in court. As a general

10

rule, courts should avoid that, but its occurrence does not always require reversal." *Id.* The court concluded that "[b]ecause the presumption of innocence was not at stake and because the evidence naturally showed that appellant was imprisoned, we hold he was not harmed by having been seen once in handcuffs shortly before trial." *Id.* In this regard, the court noted that the jury's view of the inmate in handcuffs was the result of him being transported to court while in custody. *Id.* The court further noted that because the handcuffs were removed during trial this would likely permit the jury to assume that the inmate posed no danger. *Id.*

Here, there is no indication that the trial court ordered Appellant to be restrained upon entry into the courtroom, and there is no evidence that Appellant was restrained during trial. Thus, Appellant's restraints were likely the byproduct of his recent transfer while in custody, rather than an order by the trial court. *See id.* Be that as it may, trial courts should strive to prevent members of the venire panel from seeing a litigant in jail attire or restraints "except for good cause shown." *See id.* In this regard, courts "should try to minimize the potential for harm." *Id.* Irrespective of why Appellant was shackled before trial, the question before us is the manner in which the trial court responded to the situation once it was apprised of the alleged occurrence. On this record, the trial court did not abuse its discretion by denying Appellant's motion for mistrial.

As we noted previously, a mistrial should only be granted when the prejudice is incurable. *Givens*, 608 S.W.3d at 71. Thus, an assessment of the potential harm, if any, of the event that precipitated the motion for mistrial is necessarily required in order to determine if the trial court abused its discretion by denying the motion for mistrial. Here, as we have noted, there is no indication in the record that the venire panel saw Appellant in jail attire and restraints. The event happened prior to trial rather than during trial, a circumstance that the First Court of Appeals found to be significant in *Carson*. 14 S.W.3d at 780. Also, the trial court was aware that,

11

because of the nature of the proceedings, the jury would soon learn that Appellant was in prison. *See U.S. ex rel. Stahl v. Henderson*, 472 F.2d 556, 557 (5th Cir. 1973) ("No prejudice can result from seeing that which is already known."). Additionally, the trial court likely considered measures that Appellant could have taken during trial to mitigate the situation, including asking voir dire questions about the incident or asking for the trial court to instruct the jury members to disregard what they might have seen. Finally, Appellant was not restrained during his trial, a fact that the court in *Carson* found to be significant as an indication that the inmate did not pose a risk. 14 S.W.3d at 780. As a result of these considerations, we conclude that the trial court did not abuse its discretion by overruling Appellant's objection and denying Appellant's motion for mistrial. As such, we need not address Appellant's contention that he was harmed by the trial court's rulings. We overrule Appellant's first and second issues.

## Sufficiency of the Evidence

### Evidence at Trial

As noted previously, Dr. Dunham opined that Appellant has a behavioral abnormality. To reach this opinion, Dr. Dunham reviewed "[p]robably a couple of thousand pages" of Appellant's records, conducted a Static-99R and PCLR test, and conducted a video conference interview with Appellant via computer on June 21, 2021.[3] The interview lasted for one hour and forty-five minutes, which Dr. Dunham testified was within the average range of length of time for a risk assessment evaluation.

Dr. Dunham defined a behavioral abnormality as "a congenital or acquired condition that affects a person's emotional or volitional capacity" and "predisposes the person to commit a sexually violent offense to the extent that the person becomes

---

[3]Dr. Dunham testified that COVID-19 protocols prevented him from visiting Appellant in person.

12

a menace to the health and safety of others." Dr. Dunham testified that he analyzes "risk factors, protective factors, positive factors, [and] diagnoses" when determining whether a person has a behavioral abnormality.

Dr. Dunham defined a "risk factor" as something an offender has exhibited in the past or at present that has a significant correlation with reoffending. Dr. Dunham defined a protective factor as "something that decreases risk once it's been established," and defined a positive factor as something "good to have. It might help the person succeed better in the future but it's not to the level of a protective factor which would be a risk reducer."

Dr. Dunham testified that Appellant possessed "pretty significant" risk factors, including:

> A pattern of behavior, the -- just the level of sexual deviancy toward children . . . the offending while he is on probation, while he's in sex offender treatment, and then his current beliefs, his dynamic risk factors so the way he describes what happened and . . . his lack of empathy, lack of remorse, poor understanding of his deviancy, poor understanding of his risk.

Dr. Dunham defined "sexual deviance" as "an abnormal sexual behavior that causes some kind of problem within that person or offends somebody else." Dr. Dunham explained that Appellant's statements regarding his sexual attraction to children and multiple sex offense convictions involving children are indicative of a "life-long pattern" of sexual deviancy, specifically "pedophilia . . . a condition that's chronic and life long [sic] and does not go away." Dr. Dunham diagnosed Appellant with "Pedophilic disorder, sexually attracted to both males and females, the nonexclusive type," in accordance with the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5). Dr. Dunham noted that Appellant said alcohol caused his sexual attraction to children. Dr. Dunham testified that he did not

"buy" Appellant's story because it is sexual deviancy that causes a person to sexually offend—not alcohol.

Appellant's first convicted offense was against his friend's ten-year-old daughter. Dr. Dunham testified that the victim not being a family member was significant because "people who offend against children [and] go outside the family are considered higher risk than people who stay within the family." Dr. Dunham identified evidence of Appellant grooming the victim, Appellant threatening the victim with "plant[ing] stolen property at her parents' house" to keep her silent, and the fact that Appellant committed the offense on several different occasions with other people around as risk factors specific to his first conviction.

Dr. Dunham testified that Appellant also exhibited risk factors while on probation for his first offense. Appellant was "continuously wanting to go to child-oriented places" like birthday parties, the zoo, and McDonald's, and would attempt to get permission from his probation officer to do so. Dr. Dunham emphasized that Appellant committing another sexual offense while on probation and in sex offender treatment was a "big risk factor" because Appellant was in the process of "learning . . . how to avoid reoffending and he [did] it anyway." Dr. Dunham testified that it was also significant that Appellant's second offense was against his seven-year-old son because (1) "offenders who offend against boys are considered about three times higher risk than those who offend exclusively against girls," and (2) it showed that Appellant's risk of offending was not "specific to one situation," meaning Appellant had an "expanding" victim pool.

Appellant's inconsistencies in recounting how, or even if, the offenses occurred were also significant to Dr. Dunham. Appellant had both previously admitted to the first offense and recanted his confession. The records of Appellant's first offense stated that Appellant had forced sexual contact upon the victim, but

Appellant told Dr. Dunham during his interview that the victim had initiated contact with Appellant.

Similarly, Appellant had previously admitted to "doing things" to his son and to "being sexually attracted to" him. Yet Appellant told Dr. Dunham that he had never committed an offense against his son. Instead, Appellant told Dr. Dunham that Appellant's mother had told his son to lie to his school counselor because Appellant refused to write his mother a check for cigarettes. Dr. Dunham found Appellant's explanation "not at all" credible and "bizarre" since Appellant's mother was overheard "coaching" Appellant's son to say that the incident did not happen during his interview with police and Child Protective Services.

The State took Appellant's deposition in preparation for trial, and it presented portions of it during Dr. Dunham's testimony. At the beginning of the deposition, Appellant said that he was sexually attracted to his son and recounted an offense that he had committed against his son. Yet later in the deposition, Appellant said that he had lied and that he "never did anything" to his son. Dr. Dunham testified that Appellant's inconsistencies in his deposition were significant because they indicated that Appellant is dishonest and has a habit of saying "what he thinks people want to hear."

Dr. Dunham scored Appellant at a nineteen on the PCLR test he conducted, indicating that Appellant has a "moderate" level of psychopathic characteristics. Dr. Dunham did not consider Appellant to be psychopathic or antisocial, noting that people who offend against children typically do so because of their sexual deviancy, rather than "antisocial behavior or beliefs." Dr. Dunham considered Appellant's lack of antisocial personality disorder as a positive factor, rather than a protective factor. Dr. Dunham also scored Appellant at a four on the Static-99R test he conducted and explained that Appellant's score indicates an "above average risk for being reconvicted of a sex offense compared to the average sex offender."

15

Dr. Dunham testified that he would have considered the sex offender treatment Appellant had been receiving to be a protective factor, but ultimately decided not to because Appellant had not "done well enough in the program to reduce the risk." Dr. Dunham agreed that Appellant admitting to the first offense was "a good thing," but he did not consider the confession alone to be a protective factor when looking at Appellant's treatment progress generally. Dr. Dunham testified that, at the time of trial, Appellant was in month eight of a nine-month program, but treatment notes indicated that Appellant was "struggling" with describing his offenses, "not understanding the terminology very well," and was "described as lacking some effort," despite attending classes. Dr. Dunham also opined that Appellant's recent statement, that he does not believe he is at risk to reoffend because he no longer has pedophilia, indicates that Appellant does not understand what sexual deviancy is and does not yet "have the tools" to understand his risk in the community.

Dr. Dunham identified some positive factors Appellant possessed, including Appellant's lack of disciplinary corrections while incarcerated, ability to hold a job, and family support, but he testified that these factors were "not significant enough" because "most of those things were present when [Appellant] already reoffended the second time."

Appellant also testified at the commitment trial. During his testimony, Appellant admitted to committing the first offense against his friend's daughter and denied committing the second offense against his son. Appellant testified that he has told "several different versions" about the circumstances surrounding both offenses because he tells people what he thinks they want to hear. When asked if he was telling the jury what he thought it wanted to hear, Appellant testified that he was telling the truth.

Appellant testified that he was sexually attracted to his friend's ten-year-old daughter because her clothing was "skimpy." Appellant admitted that he sexually offended against his friend's daughter three times and that he lied to his friends when he told them that the victim-initiated contact with Appellant. Appellant testified that he could not remember if he told Dr. Dunham that the victim-initiated contact with him because he had "slept since then."

Appellant denied sexually offending against his son and testified that his son lied because Appellant's mother told him to. When asked if he previously admitted to sexually offending against his son, Appellant confirmed that he had, but said his confession was a "boldface lie." Appellant testified that he admitted to sexually offending against his son in his deposition because he thought that was what the prosecutor wanted him to say.

Dr. Dunham testified that he was "concern[ed]" by Appellant writing to a friend while incarcerated and asking her for pictures of her minor daughter. Appellant subsequently testified that he only asked for pictures of his own daughter. Appellant confirmed that the friend had sent pictures of her minor children, as well, but Appellant testified that he never asked for them and returned them.

Appellant admitted that he is a sex offender and that he is "very sorry and remorseful, sad, depressed," for his actions. Appellant testified that he "learned [his] lesson" after his first offense. Appellant stated that the treatment he received provided the "tools" needed to avoid reoffending, and he did not believe that he is at risk of reoffending because he is no longer sexually attracted to children. Regarding future plans, Appellant testified that he would continue participating in sex offender treatment "[s]o in case [his] dad needs [him] [he is] there to support him" and that he will never commit another offense "[b]ecause prison is not a place for a family man."

17

At the conclusion of redirect examination, the State asked Appellant if "every time it's to your benefit you change your story on what happened with your offenses or what you have said in the past; is that right?" Appellant replied, "Yes." The State rested after Appellant's testimony.

*Legal Sufficiency*

In Appellant's third issue, he contends that the evidence is legally insufficient to support a finding beyond a reasonable doubt that he is a sexually violent predator. The Act provides for the civil commitment of sexually violent predators based on legislative findings that "a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence." HEALTH & SAFETY § 841.001.

A person is a sexually violent predator if the person "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a). The legislature defines a "repeat sexually violent offender" as a person who is convicted of "more than one sexually violent offense and a sentence is imposed for at least one of the offenses." *Id.* § 841.003(b). "Sexually violent offense" is defined in the SVP Act to include enumerated Penal Code offenses. *Id.* § 841.002(8). Finally, "[b]ehavioral abnormality" is defined as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

A commitment proceeding under the SVP act is a civil case that incorporates the "beyond a reasonable doubt" burden of proof from criminal cases. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020); *In re Commitment of*

18

*Stratton*, 637 S.W.3d 870, 875 (Tex. App.—Eastland 2021, no pet.). Thus, to civilly commit a person as a sexually violent predator, the State must prove the above elements beyond a reasonable doubt. *Fisher*, 164 S.W.3d at 639–41. We use the same legal sufficiency standard that we use in criminal cases: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Stoddard*, 619 S.W.3d at 674–75 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, we assess the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the statutory elements required for commitment beyond a reasonable doubt. *Id.* The jury is the sole judge of the witnesses' credibility and of the weight to be given to their testimony. *In re Commitment of Harris*, 541 S.W.3d 322, 327 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

While presented as a legal sufficiency claim, the focus of Appellant's argument is that Dr. Dunham's expert opinion was inadmissible because it was unreliable. Appellant contends that the evidence was legally insufficient to support the jury's finding that he is a sexually violent predator because, without Dr. Dunham's unreliable opinion, "no reasonable jury could have found [Appellant] to be a Sexually Violent Predator because he was not shown to be so likely to offend that he constitutes the type of menace that the Constitution permits to be deprived of his liberty."

Appellant takes issue with Dr. Dunham's "clinically adjusted actuarial approach" because Dr. Dunham "discounted the only actuarial evidence offered, which was the Static-99 score and tables." Appellant asserts that Dr. Dunham "ignore[s] the statistical results of the test" because he testified that he "avoid[s] the percentages" included in the Static-99R "altogether," and that he uses the Static-99R as "sort of a foundation that kind of forces you to look at some of the risk factors

19

involved in that test." Appellant also asserts that Dr. Dunham failed to provide a scientific basis for other factors he considered, such as Appellant's reluctance to "confess to shameful things" and whether Appellant successfully completed therapy to therapists' satisfaction. In summary, Appellant asserts that Dr. Dunham "unreliably applied the principles and methodologies of forensic science, by taking the 'actuarial' out of the 'clinically adjusted actuarial approach'" with no scientific basis for doing so.

We note that Appellant did not make a timely objection to the reliability of Dr. Dunham's opinion in the trial court. Appellant cites *Coastal Transportation Company v. Crown Central Petroleum Corporation* for its holding that, when a reliability challenge is "restricted to the face of the record[,] for example, when expert testimony is speculative or conclusory on its face," a party can challenge the legal sufficiency of the evidence on appeal "even in the absence of any objection to its admissibility" in the trial court. 136 S.W.3d 227, 233 (Tex. 2004). However, the supreme court in *Coastal Transportation* distinguished no-evidence reliability challenges from reliability challenges based on an expert's underlying methodology:

> [W]hen a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis. However, when the challenge is restricted to the face of the record[,] for example, when expert testimony is speculative or conclusory *on its face*[,] then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility.

*Id.* at 233 (emphasis added); *see also Maritime Overseas Corp v. Ellis*, 971 S.W.2d 402, 412 (Tex. 1998).

At the root of Appellant's third issue is his contention that Dr. Dunham did not follow a "clinically adjusted actuarial approach." Appellant's contention that Dr. Dunham's opinion had no scientific basis is incorrect—Dr. Dunham testified

that he conducted a Static-99R test and a PCLR test, diagnosed Appellant with pedophilic disorder according to the DSM-5, and determined whether Appellant possessed risk factors that are "research based." Accordingly, despite Appellant labelling Dr. Dunham's testimony as "misleading, conclusory, and speculative," Appellant is challenging the underlying methodology Dr. Dunham used in evaluating Appellant for a behavioral abnormality. Therefore, Appellant was required to make a timely objection in the trial court to preserve error. *See Coastal Transp.*, 136 S.W.3d at 233.

Regardless of the timeliness of Appellant's challenge to the reliability of Dr. Dunham's testimony, there was legally sufficient evidence to support a finding that Appellant is a sexually violent predator. Even if the basis for Dr. Dunham's opinion was unreliable, we may consider his testimony as probative evidence in our legal sufficiency review. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) ("When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable."); *see also Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020).

Appellant has two convictions for sexually violent offenses. *See* PENAL § 21.11(a); HEALTH & SAFETY § 841.002(8)(A). Dr. Dunham testified that Appellant had a behavioral abnormality at the time of his civil commitment trial because of his "sexual deviancy" and "risk of reoffending sexually against children." Appellant had previously reoffended while on probation. Dr. Dunham testified that Appellant had, within the six months before trial, written a letter to his friend from prison to ask her for pictures of her minor daughter. Appellant testified that he had a "[f]ake it to make it through the program" attitude towards therapy and that he told his treatment providers what he thought they wanted to hear. While Appellant testified that he no longer had a behavioral abnormality because he was no longer

21

sexually attracted to children, Dr. Dunham testified that pedophilic disorder is "life long."

The jury was the "sole judge of the credibility of witnesses and the weight to be given to their testimony." *Stoddard*, 619 S.W.3d at 674 (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). Viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt that Appellant is a sexually violent predator. We overrule Appellant's third issue.

*Factual Sufficiency*

In Appellant's fourth issue, he contends that the evidence is factually insufficient to support a finding beyond a reasonable doubt that Appellant is a sexually violent predator because there was "little to no evidence supporting a conclusion that [Appellant] cannot control a sexual impulse to commit a violent offense." The scope of our review is limited to whether the State proved the statutory elements of the Act—whether Appellant has committed two or more "certain enumerated sexually violent offenses" and whether Appellant "suffers from a behavioral abnormality that makes [him] *likely to engage* in a predatory act of sexual violence." *Id.* at 678 (emphasis added). The Act does not require that a sexually violent predator must lack control over his sexual impulses, and we decline to address whether Appellant does. *See id.*; *see also* HEALTH & SAFETY § 841.002, 841.003.

The standard of review for a factual-sufficiency review differs from the evaluation for legal sufficiency. A "factual sufficiency review is premised on consideration of the entire record." *Stoddard*, 619 S.W.3d at 674 (citing *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018)). As with the legal sufficiency analysis, there is still an assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so. *Id.* at 674. "However, disputed

evidence that a reasonable factfinder could *not* have credited in favor of the finding is treated differently" in a factual sufficiency analysis. *Id.* at 676. Thus, in sexually violent predator cases,

> where the burden of proof is beyond a reasonable doubt, the evidence is factually sufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the [sexually violent predator] finding, along with the undisputed facts that do not support the finding, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met.

*Id.* at 674–75. A reviewing court's mere disagreement with the factfinder "as to the proper evidentiary weight and credibility cannot be the basis of a reversal on factual-insufficiency grounds." *Id.* at 677.

The undisputed facts upon which Appellant relies, which he contends are contrary to the verdict, are that (1) Appellant "is not a psychopath," and Dr. Dunham testified that "antisociality is not an issue for him"; (2) Appellant "had no violent convictions or disciplinaries"; (3) Appellant "did not assault strangers"; and (4) Appellant has family support and a good employment history. Appellant contends that the disputed facts that a reasonable factfinder could not credit in favor of the verdict are (1) "the contention that Dr. Dunham's opinion is actuarial in any way;" (2) "that lack of successful treatment equates to a behavior (sic) abnormality;" and (3) "that the human tendency to attempt to present oneself in the most flattering light feasible is itself supported by research as a risk factor." We note that these are not facts in dispute so much as contentions regarding the probative value of Dr. Dunham's testimony.

We have reviewed the entire record in accordance with the applicable standard of review. The disputed evidence in this case consists of Dr. Dunham's application of the Static-99R, testimony that Appellant had not successfully completed therapy, and testimony that dishonesty about offenses is a risk factor. The extent that the jury

could not have credited this evidence in favor of the verdict is limited at best. The undisputed evidence contrary to the jury's verdict consists of Appellant's lack of psychopathy and antisocial personality disorder, lack of disciplinary history while incarcerated, a support system and employment history, and lack of convictions for offending against children that he did not know. This undisputed evidence is also marginal. Thus, the evidence contrary to the jury's verdict was not so significant that the jury could not have found beyond a reasonable doubt that Appellant suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence and that Appellant is a sexually violent predator. Accordingly, we overrule Appellant's fourth issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE

March 28, 2024

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

24